**HAVLICEK/FLEISHER
ENTERPRISES, INC.,
Plaintiff,**

**v.**

**Ulysses L. BRIDGEMAN, Jr., Bridgeman Foods, Inc. and Bridgeman Foods II, Inc., Defendants.**

**No. 90–C–909.**

United States District Court,
E.D. Wisconsin.

Feb. 13, 1992.

Robert H. Friebert, Friebert, Finerty & St. John, S.C., Milwaukee, Wis., for plaintiff.

Stephen Jacobs, Reinhart, Boerner, Van Deuren, Norris & Rieselbach, Milwaukee, Wis., for defendants.

## DECISION AND ORDER

WARREN, Senior District Judge.

Before the Court is the plaintiff's motion for summary judgment based upon the defendant's alleged breach of his fiduciary duty by usurping a corporate opportunity. The Court finds that the defendant has raised several questions of fact which must be resolved at trial; therefore, the plaintiff's motion is denied.

## I. BACKGROUND

Larry Fleisher ("Fleisher") was an attorney and an accountant who founded the National Basketball Players Association. Bridgeman Depo. at 22; Marc Fleisher's Aff., Ex. A. He knew many professional basketball players both as clients and as friends. One such athlete was John Havlicek ("Havlicek"), a former guard for the Boston Celtics, whom Fleisher had represented in contract negotiations. Havlicek Depo. at 6.

After Havlicek retired from professional basketball, he wished to explore other financial opportunities. His neighbor, Dave Thomas, was the founder of Wendy's International, which operated Wendy's Old Fashioned Hamburgers Restaurants ("Wendy's"). Thomas sparked Havlicek's interest in the fast food business. Havlicek discussed such a venture with Fleisher, who had prior experience with restaurants as an officer of the Restaurant Associates. Fleisher not only gave his approval but suggested that he and Havlicek join forces and invest in Wendy's together.

The two men formed a corporation named Havlicek/Fleisher Enterprises, Inc.

("HFE") in late 1978 which subsequently acquired the rights to develop Wendy's restaurants in Westchester County, New York. Marc Fleisher's Aff. at ¶ 5. They brought in Alex Fragnito ("Fragnito") to supervise the development and operation of the restaurants in July, 1979. Fragnito's Affidavit at 2. Fragnito owned 15% of HFE's shares and the remaining 85% was divided equally between Fleisher and Havlicek. *Id.* Havlicek and Fleisher received an annual draw that varied year to year, and Fragnito was paid a management fee which was determined by Fleisher alone. Havlicek Depo. at 13. HFE currently oversees three restaurants, which have been profitable. Fragnito's Aff. at ¶¶ 1–3.

Fleisher was also friendly with the defendant, Junior Bridgeman ("Bridgeman"), who played basketball for the Milwaukee Bucks. Fleisher had helped Bridgeman negotiate basketball contracts, and their business relationship developed into a friendship. He gave Bridgeman occasional tips on investment opportunities, and had recommended several to him in the past, such as breeding horses and building tuna boats. Bridgeman Depo. at 16, 19–20. In 1984, when Bridgeman became a passive investor in a Wendy's franchise in Illinois, Fleisher inspected the store and its staff, negotiated the deal, and hired a local attorney to finalize the transaction. *Id.* at 28, 30. He also sent Fragnito out to help set up the store's accounting and banking systems. *Id.* at 52. After Bridgeman acquired the store, Fleisher continued to assist him, looking over the restaurant's financial statements and discussing them with him. *Id.* at 31.[1]

In late 1986, Bridgeman made an offer to buy out the owners of the Illinois store but was turned down.[2] He informed Lee Dudley, an executive at Wendy's, that he was not happy as a passive investor, whereupon Dudley offered him the chance to purchase

---

1. In 1987, Bridgeman also invested in a Wendy's franchise in New York with Fleisher and Paul Silas, another basketball player and a friend of Bridgeman's. Bridgeman's Depo. at 35. They named this venture Bridgeman/Silas, Inc.

Fragnito lent his assistance to this operation as well, at Fleisher's suggestion. *Id.* at 51, 55.

2. Bridgeman eventually sold his interest to the other owners of the Illinois location in 1989.

five low-volume stores in Milwaukee. Bridgeman Depo. at 61–63. Bridgeman consulted Fleisher about this opportunity, who advised him that it was promising, and told him to take advantage of it. Moreover, Fleisher decided that he would also be interested in investing along with Bridgeman. Although Bridgeman had not anticipated this development, he was not opposed to it and continued to negotiate with Wendy's. *Id.* at 73.

Eventually, Wendy's agreed to sell the five stores to Bridgeman. Bridgeman entered into the deal as Bridgeman Foods, Inc. ("BFI"), a corporate entity he and Fleisher had formed for the purpose of acquiring the restaurants. BFI closed on the five stores on May 13, 1988. The law firm of Godfrey & Kahn handled the legal work associated with the acquisition, including the incorporation of BFI. Bridgeman Depo. at 80–81.

Although Bridgeman had originally believed that he and Fleisher would be the sole shareholders, Fleisher had not invested in BFI as an individual. Instead, he bought the shares on behalf of HFE, the corporation he owned along with Havlicek and Fragnito. Bridgeman did not realize that the other shareholder would be a corporation until Fleisher presented a check at the closing with the heading "HFE, Inc." at the top. Bridgeman Depo. at 91. However, the deal was practically consummated and Bridgeman did not want to delay it, so he did not object, even though having a corporate shareholder meant that BFI would not be able to enjoy the tax benefits associated with a subchapter S corporation.

Each shareholder made a $25,000 capital contribution to BFI and loaned it an additional $67,000,[3] receiving 50 percent of BFI's stock in return. Marcus Depo., Ex. 14. However, only Bridgeman owned voting stock, which made him the controlling shareholder. Bridgeman Depo. at 93. He held this position because Wendy's did not know about HFE's association with Bridgeman, and Fleisher did not wish to disclose

this information. Marcus Depo. at 23.[4] After buying all of the shares, he transferred 50% to HFE when the transaction with Wendy's was finalized, so Wendy's would not be able to object to HFE's involvement in BFI. Marcus Depo. at 23. Bridgeman served as BFI's president, treasurer and chief executive officer; Fleisher was vice-president and secretary as well as a director of the corporation.

Fleisher had told Havlicek about the investment he planned to make on HFE's behalf, but he did not disclose the details of the transaction. He merely stated that there were five Wendy's restaurants in Milwaukee that Junior Bridgeman had been thinking of buying and that HFE could become a 50% owner by paying $90,000. Havlicek Depo. at 19–20. Havlicek went to Milwaukee for one day to look over the restaurants after he had given Fleisher a check for $45,000, his share of the capital investment. After BFI was formed, Fleisher informed Havlicek about its progress once every few months. Although Havlicek received monthly financial statements for HFE, he only received between one and three such statements concerning BFI. He never spoke to Bridgeman about BFI's progress. Havlicek Depo. at 25–27. Fragnito and Bridgeman did not discuss BFI either, since the two men were not on good terms with one another. Fragnito Depo. at 64; Marc Fleisher Depo. at 53. Between the time of BFI's inception and May, 1989, Fleisher was the only shareholder of HFE with whom Bridgeman ever had any contact. Bridgeman Depo. at 121; Marc Fleisher Depo. at 102. This was not unusual, since HFE's accountant observed that Fleisher made the ultimate decisions about whether to invest in an opportunity, and that the other shareholders of HFE generally looked to him for guidance. Eugene McGillycuddy Depo. at 26.

The five franchises improved their sales volume under Bridgeman's ownership, due in part to his local celebrity and willingness to make personal appearances promoting

---

3. Wendy's provided the rest of the financing—in excess of $500,000. Bridgeman Depo. at 93.

4. Apparently, Wendy's had a low opinion of HFE due to some remarks Fleisher had made at one time. Bridgeman Depo. at 85–87.

the restaurants and motivating his staff. Bridgeman spent most of his time in Milwaukee and communicated with Fleisher on a regular basis. Bridgeman Depo. at 107–109. They hired William Rewolinski, Bridgeman's personal accountant, to be BFI's accountant, and Paul Thompson to manage the five restaurants. Rewolinski Depo. at 8. Although Bridgeman thought Thompson would make a good employee after the initial interview, he did not hire him on the spot. Instead, Thompson flew to Kansas City where he met with Fleisher. Then Bridgeman and Fleisher made the joint decision to hire Thompson for the job. Bridgeman Depo. at 112.

In October of 1988, Bridgeman became interested in expanding his fast food investments. He and Thompson met with Gilles Gallant, a Wendy's executive, in Chicago for a day to discuss acquiring the remainder of the Wendy's franchises in the Milwaukee area. Bridgeman Depo. at 127–28, 184; Thompson Depo. at 28. Bridgeman informed Fleisher of the meeting afterwards. Bridgeman Depo. at 139. Over a period of several months, Wendy's constructed a 16–store deal which it offered to Bridgeman. Part of the deal included an option to open five additional Wendy's restaurants over a five-year period. Bridgeman Depo., Ex. 19. In January or February of 1989, Bridgeman hired attorney Ulice Payne of Whyte & Hirschboeck to represent Foods II. Payne Depo. at 12–13. Rewolinski told Bridgeman that it might be a good idea to ask Fleisher whether he would be interested in this deal due to Fleisher's experience with Bridgeman and the fast food business. Rewolinski Depo. at 66–67.

Bridgeman discussed the prospect of buying an additional 16 restaurants with Fleisher on several occasions during the winter and spring of 1989 in order to obtain advice about the transaction. He received written information from Wendy's about the sixteen stores in February, 1989, which he forwarded to Fleisher for his review. Fleisher knew that Wendy's did not intend to finance the purchase as it had done previously, and he had been apprised of the costs of acquiring the stores. Bridgeman Depo. at 147–48, 164. He expressed some uneasiness about the fact that Wendy's refused to offer financing, since it had done so previously when BFI acquired the five restaurants. Nevertheless, Bridgeman continued to negotiate with Wendy's. Although Fleisher was unable to come to a conclusive determination without more documentation, he continued to caution Bridgeman against investing in the new deal.

Sometime in the spring of 1989, Bridgeman decided that HFE should not be included in the anticipated transaction. With HFE as a shareholder, Bridgeman would once again be denied the tax advantages of a subchapter S corporation. Moreover, due to Wendy's refusal to finance the deal, Bridgeman would be forced to obtain a loan with personal guarantees. Rewolinski informed him that if he and HFE were the only two shareholders, the guarantee would have to come from him, since corporations are not able to guarantee loans personally. Bridgeman told Fleisher that if he wanted to share in this opportunity, they should form a new, subchapter S corporation rather than continue to use BFI. Bridgeman Depo. at 167–69.

On May 4, Bridgeman telephoned Fleisher and spoke with him for approximately 20 minutes. In the course of this conversation, Fleisher stated in unequivocal terms that he was not interested in the deal as it stood. First, he said that several of the sixteen stores were "dogs" and that were BFI to make any sort of deal with Wendy's, it should acquire ten stores at the most. Bridgeman Depo. at 150. However, Bridgeman told him that Wendy's was not interested in owning just a few restaurants in the Milwaukee area and its offer was "all or nothing." Bridgeman Depo. at 143. At the end of their conversation, Bridgeman was convinced that Fleisher did not want to participate in the deal as it stood. Bridgeman Depo. at 178. Immediately after the discussion, Fleisher went to the New York Athletic Club to play squash and suffered a fatal heart attack after the game. Marc Fleisher's Affidavit at ¶ 7. Bridgeman was left as the sole director and officer of BFI. Bridgeman Depo. at 215.

After Larry Fleisher's death, both Fragnito and Peter Calfee ("Calfee"), Havlicek's financial advisor, contacted Rewolinski about BFI. Fragnito requested that financial statements and related documents be forwarded to HFE's offices in New York. Calfee telephoned to introduce himself to Rewolinski and to discuss the tax ramifications of Fleisher's death. Rewolinski Depo. at 118. Neither Calfee nor Fragnito requested any information other than financial documentation of BFI's existing operations. *Id.* at 121.

Bridgeman formed a new corporation named Bridgeman Foods II ("Foods II") under which he acquired the additional 16 restaurants on May 11, 1989. He closed on the deal on June 9, 1989 with Ulice Payne's legal assistance. Between the date of Larry Fleisher's death and June 9, Bridgeman did not speak to any of HFE's shareholders. Bridgeman Depo. at 212. At the end of June, 1989, Paul Thompson was transferred from BFI's payroll and put onto Foods II's payroll. BFI subsequently paid Thompson a management fee of $15,360 per month.[5] Fragnito's Aff. at ¶ 8. The HFE shareholders were not informed of the transfer or the fee, nor were they consulted before these changes were effected. Bridgeman Depo. at 244. Several of BFI's stores were used to train Foods II's employees. Bridgeman Depo. at 295.

The shareholders of HFE were notified of Bridgeman's newest business venture on August 22, 1989 at a meeting in New York. After discussing the troubled financial status of the five stores owned by BFI, Bridgeman announced that he had formed a new corporation which had acquired 16 new Wendy's restaurants in the Milwaukee area and that Paul Thompson, the manager of BFI's stores, would be managing some of the new stores as well. Marc Fleisher's Aff. at ¶ 8.[6] He also offered to buy out HFE's interest in BFI. *Id.* at Ex. B. Bridgeman and Rewolinski thought it was fair to tell the HFE shareholders about Foods II, since Bridgeman was interested in buying their shares in BFI and there was a possibility that this information would have an impact on their decision whether or not to sell. Bridgeman Depo. at 235–36; Rewolinski Depo. at 143.

HFE's shareholders were astounded at Bridgeman's revelation. Marc Fleisher informed him that he might be liable to the shareholders for usurping a corporate opportunity. Bridgeman apologized, in particular to Fleisher's wife, Vicky, and said that he had made a mistake. However, he did not understand Marc Fleisher's accusations concerning "corporate opportunities," and those words did not have any specialized legal meaning to him. Bridgeman Depo. at 230. He claimed that he did not discuss the opportunity with HFE's shareholders because he did not know who to call. He also believed that HFE was not interested in investing in the opportunity under the terms put forth by Wendy's, since Fleisher had rejected it.

After this meeting, Marc Fleisher reviewed his father's records. He found a file entitled "Bridgeman Foods New File" which contained documents pertaining to the possible acquisition of the sixteen stores. Among these documents included financial projections for the stores, financial information about ten stores,[7] copies of faxes exchanged between Fleisher and Rewolinski, and a typed projection, along with Fleisher's handwritten notes. Marc Fleisher Depo. at 13. One handwritten note read, "Bill, I can't relate the projections to anything since I don't have the actual number for any annual period. Please send. Larry." Rewolinski Depo. at 54. Rewolinski testified that he sent a number of documents containing financial information about the proposed transaction to Fleisher, but he does not remember whether he sent the specific information Fleisher requested.

---

5. This is the amount BFI had been paying for administrative expenses immediately prior to June, 1989.

6. Bill Rewolinski informed HFE's shareholders that Thompson was only managing seven restaurants—the five in which HFE had an interest along with two of Foods II's stores. Marc Fleisher's Affidavit, Ex. B.

7. Marc Fleisher was not sure whether the ten stores were part of the 16 store deal.

Rewolinski Depo. at 54–59. None of the letters of intent sent from Wendy's to Bridgeman or information from banks concerning financing were in the file.

BFI had paid approximately $150,000 per store when it acquired its franchises. Foods II, in contrast, paid $84,375 for each of its sixteen stores. Fragnito Affidavit at ¶ 7. Ever since Foods II was formed, it has shared the same office as BFI. Rewolinski Depo. at 198. HFE would have had the ability to share the costs of acquiring the additional restaurants with Bridgeman. Fragnito Affidavit at ¶ 9. Fragnito testified that HFE viewed its venture with BFI as creating a foothold in the Milwaukee area for future expansion in the fast food restaurant business. Fragnito Affidavit at ¶ 7. Managing more restaurants would have enabled the corporation to spread administrative costs over twenty-one stores rather than five, thus reducing expenses for the stores on an individual basis.

Bridgeman testified that he did not think about whether the sixteen stores would have been an opportunity for BFI, nor did he discuss this issue with Fleisher. His attorney, Ulice Payne, does not remember advising him as to whether the acquisition of the 16 stores was a corporate opportunity of BFI. Payne Depo. at 66. Payne knew that Bridgeman had been discussing the acquisition with Fleisher and believed that Fleisher was not interested in investing in Foods II. *Id.*

The shareholders of HFE filed a derivative action in this Court on September 14, 1990. In its complaint, HFE alleges that Bridgeman usurped a corporate opportunity, charged unfair management fees to BFI, and charged his and Foods II's legal expenses to BFI. It demands relief in the form of an accounting, damages equal to Bridgeman's unjust enrichment, and imposition of a constructive trust over the portion of Foods II's assets that should have been offered to BFI.

## II. PARTIES' ARGUMENTS

HFE claims that Bridgeman should have presented the opportunity to purchase the sixteen stores to each of its individual shareholders, so that they could have voted upon whether to accept or reject it. As controlling shareholder, and as the sole director and officer of BFI after May 4, 1989, he owed a fiduciary duty to HFE and its shareholders to act in their best interests. When he had the opportunity to invest in more restaurants, this became a corporate opportunity, and by taking it himself, he breached his fiduciary duty.

Bridgeman did not offer the opportunity to BFI, HFE alleges. The disclosure made to Fleisher was incomplete, as evidenced by his notation in the file which stated that he could not evaluate the figures with the information available to him. Without full disclosure, an informed acceptance or rejection of a corporate opportunity cannot be made. Bridgeman should not be allowed to testify about any conversations he claims to have had with Fleisher on the day of his death, as he is not competent to testify under Wisconsin's Dead Man's Statute. Finally, Bridgeman's use of BFI's facilities for Foods II's benefit and his charging BFI a management fee show that he has not kept BFI's best interests in mind.

In response, Bridgeman claims that the opportunity was not corporate at all, but one that was offered to him as an individual. BFI did not have an interest in the opportunity at all; thus, there was never a corporate opportunity. There are material issues of fact concerning the extent of Bridgeman's disclosure and Fleisher's rejection which can only be resolved at trial. Furthermore, Bridgeman claims that he acted in good faith at all times and HFE cannot show that any of his actions subsequent to Fleisher's death were unfair.

## III. LEGAL FRAMEWORK

### A. *Summary Judgment*

The standard for summary judgment was set forth by the Seventh Circuit in *Howland v. Kilquist*, 833 F.2d 639 (1987). **Fed.R.Civ.P.** 56(c) provides that a district court shall grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show

that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter or law." When the facts are disputed, the parties must produce proper documentary evidence to support their contentions, and may not rest on mere allegations in the pleadings, *Posey v. Skyline Corp.*, 702 F.2d 102, 105 (7th Cir.1983), or upon conclusory statements in affidavits. *First Commodity Traders v. Heinold Commodities*, 766 F.2d 1007, 1011 (7th Cir.1985). In reviewing a grant of summary judgment, all reasonable inferences from the evidence presented must be drawn in favor of the opposing party. *Matsushita Electronics Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 [106 S.Ct. 1348, 1356, 89 L.Ed.2d 538] (1986) ... The mere existence of a factual dispute will not bar summary judgment unless "the disputed fact is outcome determinative under governing law." *Egger v. Phillips*, 710 F.2d 292, 296 (7th Cir. 1983) (*en banc*).

*Id.* at 642.

The United States Supreme Court further clarified the scope of Fed.R.Civ.P. 56 in *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) and *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In *Celotex*, the Court held that the initial burden is on the moving party to demonstrate "with or without affidavits" the absence of genuine issues of material fact and that judgment should be granted as a matter of law in the moving party's favor. *Id.*, 477 U.S. at 323, 106 S.Ct. at 2552–53. Once the moving party has met its burden, the opposing party must "go beyond the pleadings" and designate specific facts to support or defend each element of the

cause of action, showing there is a genuine issue for trial. *Id.* at 322–23, 106 S.Ct. at 2552–53.

In *Anderson*, the Court stated that the presence of a genuine issue of fact is to be determined by the substantive law controlling that case or that issue. *Id.*, 477 U.S. at 252, 106 S.Ct. at 2512. The Court added that for purposes of Rule 56, a genuine issue of material fact exists "if evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* at 248, 106 S.Ct. at 2510. The evidence must be evaluated in the light most favorable to the nonmovant in that all justifiable or reasonable inferences are to be drawn in its favor. *Id.* at 255, 106 S.Ct. at 2513–14.

### B. *Dead Man's Statute* [8]

Wisconsin's Dead Man's Statute, codified in Wis.Stat. § 885.16, provides in pertinent part:

"No party or person in his own behalf or interest, and no person from, through or under whom a party derives his interest or title, shall be examined as a witness in respect to any transaction or communication by him personally with a deceased or insane person in any civil action or proceeding, in which the opposite party derives his title or sustains his liability to the cause of action from, through or under such deceased or insane person ... unless such opposite party shall first, in his own behalf, introduce testimony of himself or some other person concerning such transaction or communication, and then only in respect to such transaction or communication of which testimony is so given or in respect to matters to which such testimony relates." [9]

This statute stems from the common law belief that there would be a powerful temp-

---

**8.** Although rules of evidence are procedural and applied by federal courts in diversity actions, a district court must apply its state's Dead Man's Statute pursuant to Federal Rule of Evidence 601, if the statute is applicable to an element of a claim or defense of the action.

**9.** Section 885.17, which extends Section 885.16 to transactions the party has had with an agent of the adverse party when that agent is deceased, provides:

No party, and no person from, through, or under whom a party derives his interest or title, shall be examined as a witness in respect to any transaction or communication by him personally with an agent of the adverse party or an agent of the person from, through or under whom such adverse party derives his interest or title, when such agent is dead ...

tation for a party to misrepresent the "transaction or communication" he had with the deceased party, who obviously could not rebut his testimony. Many other states adopted statutes similar to Wisconsin's to prevent the living from obtaining an unfair advantage over the deceased. Currie, *Transactions With Deceased Persons*, 1948 Wis.L.Rev. 491, 492 (1948). In order to render an otherwise competent witness incompetent under the Dead Man's Statute, a party must show that: 1) there was a transaction or communication between the decedent and the witness; 2) the witness has an "interest" in the matter; and 3) the party's liability or cause of action arose from, through or under the deceased person. Section 885.16 Wis.Stats.

█ An ordinarily competent party witness will be rendered incompetent to testify as to transactions or communications he had with the decedent under the Dead Man's Statute. Nevertheless, a witness to these transactions or communications is competent to testify as to their substance if he was not a party to the transaction and did not influence it in any way. *Stuart v. Crowley*, 195 Wis. 47, 217 N.W. 719 (1928). The Dead Man's Statute was apparently intended to offset interested parties' lack of objectivity; therefore, when a witness has no interest in the outcome of the action, he has no reason to conceal or lie about facts surrounding the transaction. *See e.g. Estate of Kemmerer*, 16 Wis.2d 480, 114 N.W.2d 803 (1962), in order to disqualify a witness from testifying under § 885.16, it is necessary "(1) That the witness has a certain type of interest, and (2) that the testimony relates to a transaction or communication had by the witness personally with the deceased." *Id.* at 486, 114 N.W.2d 803.

█ In *Lowry v. Lowry*, 211 Wis. 385, 247 N.W. 323, 248 N.W. 472 (1933), the Wisconsin Supreme Court held that even though a witness had been made a party to a legal action, he was still competent to testify about a conversation he had had with the decedent. The court found that he was not a necessary party to the action, would not gain or lose by the litigation, and

did not have even a remote interest in the property or the outcome. *Id.*, 211 Wis. at 389, 247 N.W.2d 323. Likewise, an agent, who is distinguishable "from a stockholder, officer or trustee of a corporation," may testify as to transactions with the deceased when he has "no legal interest whatever in the subject matter of the action, although [he] may be remotely interested, in some other sense of the term, in the outcome of the litigation." *Nolan v. Standard Fire Insurance Co.*, 243 Wis. 30, 36, 9 N.W.2d 74 (1943). In a more recent decision, the Wisconsin Supreme Court held that a witness's interest must be "present, certain and vested, not just a remote or contingent interest." *In Matter of Estate of Reist*, 91 Wis.2d 209, 224, 281 N.W.2d 86 (1979). Neither the spouse nor the child of an interested party may not be precluded from testifying under the Dead Man's Statute, since their interests are held to be remote and contingent. *See e.g.*, *Estate of Christen*, 72 Wis.2d 8, 12, 239 N.W.2d 528 (1976); *Estate of Nale*, 61 Wis.2d 654, 213 N.W.2d 552 (1974).

A party may prevent an opposing witness from testifying if the party has a cause of action "from, through or under" the deceased person. Section 885.16, Wis. Stat. The most obvious situation in which this cause of action arises is when the decedent's estate is the opposing party. When the decedent's estate is not a party, the question becomes more complex. A widow was permitted to testify about a conversation between her late husband and the agent of an insurance company, the defendant, since the company's liability arose through its insurance contract, not "from, through or under" the husband, even though he was a party to the contract. *Chamberlain v. Prudential Insurance Co.*, 109 Wis. 4, 85 N.W. 128 (1901). Similarly, a father whose son was killed by a negligent motorist was permitted to testify in a wrongful death action that his son had not received wages for working on the family's farm. *Bump v. Voights*, 212 Wis. 256, 249 N.W. 508 (1933). The court found that even though the motorist was the opposite party, "[h]e sustains his liability through his own negligence and not

through or under any transactions of the deceased son, or any act on his part." *Id.* at 261, 249 N.W. 508.

Although the Dead Man's Statute is still good law in Wisconsin, it is viewed with disfavor because:

> (1) it '. . . rests upon an archaic view of the law—the view that one who has an interest in a controversy should not be allowed to testify.' *Estate of Molay*, 46 Wis.2d 450, 458, 175 N.W.2d 254 (1969); and
>
> (2) there is an '. . . evident lack of rational basis for the statute [citations omitted] . . .' *Id.* at 458, 175 N.W.2d 254.

*In Matter of Estate of Reist*, 91 Wis.2d 209, 222, 281 N.W.2d 86 (1979). The Supreme Court of Wisconsin advocates a strict construction of the statute in order to limit its effect whenever possible. *Id.* at 222, 281 N.W.2d 86, citing *Estate of Nale*, 61 Wis.2d 654, 213 N.W.2d 552 (1974). This approach is consistent with the Advisory Committee's comments to Federal Rule of Evidence 601, which suggest that it is preferable for a jury to weigh the credibility of a witness's testimony rather than suppress his testimony altogether.[10]

### C. *Corporate Opportunity Doctrine*

■ In *Gauger v. Hintz*, 262 Wis. 333, 55 N.W.2d 426 (1952), the Supreme Court of Wisconsin laid the foundation for the doctrine of "corporate opportunity." The basic principle behind the doctrine is that "[o]ne who occupies a fiduciary relationship to a corporation may not acquire, in opposition to the corporation, property in which the corporation has an interest or tangible expectancy or which is essential to its existence." *Id.* at 352, 55 N.W.2d 426, citing *Blaustein v. Pan American Petroleum & Transport Co.*, 263 A.D. 97, 125, 31 N.Y.S.2d 934 (1941). Because it is axiomatic that a director of a corporation has a fiduciary duty to the corporation and its shareholders, it follows that this director may not profit personally from property he acquired while he was an acting director when he knew the corporation had an inter-

est in this property. *See e.g., Stoiber v. Miller Brewing Co.*, 257 Wis. 13, 42 N.W.2d 144 (1950).

■ A corporate opportunity arises where a corporation "has an interest or tangible expectancy [in the opportunity] which is essential to its existence." *Gauger v. Hintz*, 262 Wis. at 351, 55 N.W.2d 426. This expectancy places a mandate upon the directors to act in the corporation's behalf under certain circumstances:

> [when] directors had undertaken to negotiate in the field on behalf of the corporation, or [when] the corporation was in need of the particular business opportunity to the knowledge of the directors, or [when] the business opportunity was seized and developed at the expense, and with the facilities of the corporation . . . [A] director cannot be allowed to profit personally by acquiring property that he knows the corporation will need or intends to acquire, and that this interest, actual or in expectancy, must have existed while the person involved was a director or officer.

*Id.* Whether a business opportunity is a corporate opportunity as well is a question of fact which should be resolved by taking into account the circumstances surrounding the opportunity at the time it arose. *Borden v. Sinskey*, 530 F.2d 478 (3rd Cir.1976).

■ Although state courts have developed a number of different tests to gauge whether a business opportunity is a corporate opportunity as well, these theories are based upon the same idea. When an activity is "reasonably incident to the corporation's present or prospective business and is one in which the corporation has the capacity to engage" it will generally be considered a corporate opportunity. 3W. Fletcher, Cyc. Corp. § 861.1 at 286 (1986). The fact-finder may take into account a number of factors when determining the officer's liability; for example, the use of corporate assets to make the purchase, the officer's good faith, the manner in which

---

**10.** In some states, a witness may be competent to enter evidence into the record for purposes of summary judgment to which he would be unable to testify at trial under his state's Dead Man's Statute. *See* 67 A.L.R.3d 970. Wisconsin courts have not addressed this issue.

the opportunity was made available to the officer, and the degree of disclosure to the corporation. *Id.*

 Even if a business opportunity is offered to the director personally, he may still be obligated to offer it to the corporation if it is a corporate opportunity; that is, if the corporation has a real interest or expectancy in the opportunity or if the director's "personal use of the opportunity may hinder or defeat the plans and purposes of the corporation in carrying on or developing the legitimate business for which it was created." 3W. Fletcher, Cyc. Corp. § 861.1 at 286 (1986). The director bears the burden of showing that the corporation had no interest or would not be harmed by his acquisition of opportunity. *Id.*

 The Court of Appeals in Wisconsin has recently developed a two-prong analysis of the corporate opportunity doctrine which takes into account related law from Wisconsin and other states whose courts have spoken on this issue. *Racine v. Weisflog,* 165 Wis.2d 184, 477 N.W.2d 326 (1991). First, a court must determine whether a corporate opportunity existed at all. The burden of proof rests upon the party alleging misconduct. The fact-finder should consider a number of facts and circumstances, including, but not limited to: the corporation's financial ability to take advantage of the opportunity, its need to avail itself of the opportunity, and the amount of interest or expectancy the corporation has in the opportunity.[11] If the party alleging misappropriation of a corporate opportunity is able to show that the opportunity was a corporate one, the burden shifts to the director for the second prong of the analysis, who must prove that he did not breach his fiduciary duties.

A director may pursue a corporate opportunity in his individual capacity if he first offers the opportunity to the corporation

and the corporation rejects it. The offer must be presented to the disinterested members of the board of directors and the interested party must make full disclosure of the material circumstances surrounding the opportunity. After the board has been informed of the nature of the opportunity, it may decide whether the corporation should take advantage of it or not. If the board rejects it, the individual director is free to pursue it without any breach of his fiduciary duty. "Whether or not a valid corporate rejection occurs is contingent upon full disclosure of all material facts and circumstances, including the fiduciary's interest in personally taking the opportunity." Fletcher, § 861.1 at 287.[12]

If the director fails to offer the opportunity to the corporation in the manner required by law, he may escape liability if:

1) he acted in good faith;

2) the corporation was unable to take advantage of the opportunity;

3) the opportunity is not essential to the corporation's business;

4) the director does not use the corporation's assets to take advantage of the opportunity; or

5) the director will not be brought into direct conflict with his corporation by availing himself of the opportunity.

*Gauger v. Hintz,* 262 Wis. at 353, 55 N.W.2d 426.

Because the corporate opportunity doctrine springs from of the director's more general fiduciary duty, good faith is a defense. As a fiduciary, a director or officer is "bound to the exercise of the utmost good faith and loyalty" and may not "act adversely to the interests of [the corporation]." *General Automotive Mfg. Co. v. Singer,* 19 Wis.2d 528, 533, 120 N.W.2d 659 (1963). However, this will not restrict the director of one corporation from investing as an individual in a similar business as long as "in doing so [he] act[s] in good faith and [does] not interfere with the busi-

---

**11.** For a more complete list of factors, see *Miller v. Miller,* 301 Minn. 207, 225, 222 N.W.2d 71, 81 (1974) (cited in *Racine* ).

**12.** A material fact is defined as "a thing which [a party] knows may justifiably induce ...

[an]other to act or refrain from acting in a business transaction" in Restatement, 3 Torts § 551(1) at 117. *Ollerman v. O'Rourke Co., Inc.,* 94 Wis.2d 17, 27, 288 N.W.2d 95 (1980).

ness enjoyed by the corporation." The director is merely limited from "engag[ing] in a competing business to the detriment of the corporation which [he] represent[s]." *Bump Pump Co. v. Waukesha Foundry Co.*, 238 Wis. 643, 654, 300 N.W. 500 (1941), *citing* 13 Am.Jur. p. 953 § 999.

## IV. ANALYSIS

As a threshold determination, this Court finds that Junior Bridgeman is competent to testify as to his conversations with Larry Fleisher, since these conversations do not fall under Wisconsin's Dead Man's Statute. Taking into account Bridgeman's uncontradicted deposition, the Court also finds that there are genuine issues of material fact which preclude summary judgment in favor of the plaintiffs.

 It is clear that the first two elements of Section 885.16 Wis.Stats. have been satisfied. Bridgeman and Fleisher were business associates who obviously had a number of communications and transactions. As a defendant who stands to lose half of his investment, Bridgeman has a definite interest in this matter. If the plaintiff is able to show that its cause of action arose from, through or under Fleisher, Bridgeman must be found incompetent to testify about his last conversation with Fleisher.

However, this Court finds that HFE's cause of action did not arise from Larry Fleisher; to the contrary, it arose from Bridgeman's actions in acquiring the 16 restaurants under a new corporate identity. The telephone conversation between Bridgeman and Fleisher on May 4, 1989 did not create a cause of action or liability. At the most, it supports Bridgeman's defense to the plaintiff's claims.

This is a derivative action brought by a corporation against one of its directors. If HFE's charges are true and Bridgeman breached his fiduciary duties owed to BFI, the cause of action did not vest in HFE because of its relationship with Fleisher. Instead, Bridgeman's liability arose out of his relationship to HFE and his failure to fulfill his duty with respect to HFE's shareholders. Just as the father in *Bump v. Voights* was able to testify about his son's value to his farm in a wrongful death action, so should Bridgeman be permitted to defend himself in a derivative action. The motorist in *Bump* did not find himself in court to help determine the value of the son's services, but because his negligence caused the events leading up to the father's need to testify. Likewise, Bridgeman has not been made a defendant to help ascertain the content of the May 4 telephone call, but to account for his actions in allegedly misappropriating an opportunity to expand.

Since current law expresses disdain for the Dead Man's Statute, this Court is obliged to construe it narrowly and limit its application whenever possible. In this case, where Junior Bridgeman did not derive his liability through Larry Fleisher, it is proper to find that he is competent to testify about their conversations. To hold otherwise would be contrary to the purposes behind the statute, which was intended to prevent the living from taking unfair advantage of the dead. If Bridgeman could not testify, he would be put into the position of the dead man, unable to rebut the claims made against him by Fleisher's co-shareholders, which would allow those associated with the deceased to deprive the living of a defense.[13]

HFE has also attempted to block Paul Thompson from testifying about conversations he witnessed between Bridgeman and Fleisher. In support of its argument, it has stated that Thompson was an interested party as well, since he was an employee of both BFI and Foods II. HFE further describes Thompson as a "potential defendant" in this action who owed a duty of loyalty to BFI and its shareholders.

---

**13.** Not only is Bridgeman competent to testify, but Fleisher's statements are admissible as nonhearsay admissions of a party opponent. Fleisher, as a director of HFE, was its agent acting within the scope of his employment while he was involved in BFI. Therefore, under Federal Rule of Evidence 801(d)(2)(D), Bridgeman may testify as to the contents of Fleisher's statements.

HFE's protestations as to Thompson's competence are not persuasive. This is an action concerning an alleged breach of a fiduciary duty. Nowhere in its motion does HFE point to a case in which a mere employee of a corporation was held to have had a duty to the corporation's shareholders. Furthermore, even though Thompson may have a slight interest in the outcome of the action, since he is employed by the defendant, this interest is too remote for § 885.16 Wis.Stats. to prevent him from testifying.

Next, the Court must determine whether HFE has shown, as a matter of law, that Bridgeman usurped a corporate opportunity. Viewing the facts presented in the light most favorable to Bridgeman, the Court finds that there are substantial questions of fact about whether the opportunity was a corporate one, whether the material facts were disclosed to Fleisher, and whether Bridgeman acted in good faith.

Although the defendant has argued that the opportunity was not a corporate opportunity since it was offered to him as opposed to BFI, under *Gauger v. Hintz*, this fact is irrelevant. The factors taken into account when determining whether a business opportunity is a corporate opportunity relate to whether the corporation has "an interest or tangible expectancy" in the opportunity that "is essential to its existence." *Id.*, 262 Wis. at 351, 55 N.W.2d 426. The basic test is whether the director knows that "the corporation ... need[s] or intends to acquire" the opportunity for itself. *Id.* From a business standpoint, it would appear logical for a corporation to wish to expand in a market it already occupies. Indeed, HFE's shareholders have testified that they intended to purchase more Wendy's restaurants if any became available. However, Bridgeman's testimony that Fleisher refused to invest in the sixteen store deal contradicts HFE's statement of intent. In addition, there is no evidence that Bridgeman knew that one of HFE's objectives was to increase its market share in Wendy's restaurants in the Milwaukee area. Therefore, while the op-

portunity appears to be corporate on its face, there is no evidence that Bridgeman knew, or should have known, that BFI needed or intended to acquire the sixteen Wendy's if they became available.

In this case, there are a number of different fiduciary relationships. Junior Bridgeman, as a director and owner of BFI, owed a fiduciary duty to the other shareholder, HFE. This duty necessarily extended to HFE's individual shareholders, including Larry Fleisher. Fleisher, in turn, owed the same fiduciary duty to Bridgeman, since Bridgeman was a shareholder and Fleisher a director. Finally, Fleisher, as the only shareholder of HFE involved in an active relationship with Bridgeman, owed a fiduciary duty to the individual shareholders of HFE, both as a director of BFI and a director of HFE.

Fleisher's relationship with the shareholders of HFE did not relieve Bridgeman of his duties to these shareholders, yet there is a strong possibility that it affected Bridgeman's perception of the scope of these duties. Fleisher was the only HFE shareholder with whom Bridgeman had any sort of regular contact. Even if Bridgeman had been aware of the niceties of the corporate opportunity doctrine, he might have been justified in relying upon Fleisher to inform Havlicek and Fragnito about the sixteen store opportunity. Fragnito never demanded that he be included in the day to day business operations of BFI. From the facts presented, it appears that both Havlicek and Bridgeman relied strongly on Fleisher's financial advice, and it is reasonable for the Court to assume that Fleisher had the authority to accept or reject an opportunity on behalf of HFE.

Although the plaintiff has argued that Bridgeman had a duty to present this opportunity to the entire shareholder body of HFE, there is no support for this claim. To the contrary, the Supreme Court of Wisconsin has held otherwise in *St. Clair v. Rutledge*, 115 Wis. 583, 92 N.W. 234 (1902):

> [I]f a corporation permits its president, for any considerable length of time, to so act, and its board of directors customar-

ily omits to hold meetings for the purpose of directing the affairs of the corporation, apparently leaving its business affairs wholly to be looked after by its president, and specially, or by not acting affirmatively one way or the other, ratifies his acts, his authority to do the things which, by such conduct, he is apparently authorized to do is just as binding upon the corporation as if the power were conferred in the most formal manner.

*Id.* at 591, 92 N.W. 234. Both Havlicek and Fragnito admitted that they rarely were informed about BFI, and neither expressed dissatisfaction with "silent partner" status. Bridgeman believed that Fleisher was the only active force behind HFE's involvement with BFI. Although HFE never executed a document authorizing Fleisher to act in its behalf, it appears that Fleisher assumed this role and HFE's other shareholders ratified it by their acquiescence. While this Court accepts HFE's argument that Bridgeman alone could not reject the opportunity for BFI, it need not reach that issue. Larry Fleisher had standing to accept or reject BFI's opportunity on behalf of the shareholders of HFE.

Furthermore, there is enough evidence in the record to raise a question of fact as to whether Fleisher was informed of Bridgeman's opportunity and whether he rejected the offer as it stood. Although HFE has claimed that neither the letters of intent nor the documentation surrounding Bridgeman's quest for financing were not present in Fleisher's file, this does not demonstrate conclusively that Fleisher had not been informed of the contents of these documents. Both Bridgeman and Rewolinski have testified that Fleisher knew the details of the financing that Wendy's would have required, and that he did not approve of this arrangement. Although there is no indication that Fleisher knew about the right to develop five additional restaurants, it is not clear whether this fact is material.

"Whether the nondisclosure [of a fact] is material is ... a question of fact to be determined by a jury," *Ricci v. Proprietors Ins. Co.,* 102 Wis.2d 720, 308 N.W.2d 419 (1981). Although the option to expand in the Milwaukee area was certainly relevant to the transaction, it is not clear whether it was material as a matter of law. Because the definition of materiality adopted in Wisconsin reflects the discloser's state of mind,[14] the Court cannot find that Bridgeman knew that Fleisher might have changed his mind about the whole transaction if the option was brought to his attention. Indeed, Fleisher made it clear from the very beginning that he was not happy with the terms Wendy's offered. Furthermore, the bulk of the transaction focused upon the acquisition of the existing restaurants, not the right to build more. There is the possibility that Fleisher's distaste for the deal caused Bridgeman to believe that telling him about any additional perks Wendy's offered would be futile. His dissatisfaction with the proposed transaction was so great that disclosure of this fact might not have offset Wendy's refusal to provide financing.

After forming Foods II, Bridgeman restructured the financial organization of BFI; instead of paying the administrative costs of management directly, BFI paid Foods II monthly management fees of $15,360. This was the same amount BFI had been paying previously. Although it did not benefit from the economies of scale associated with a larger operation, it is not clear whether it was entitled to this benefit. An individual director is not required to subsidize an opportunity that his corporation has rejected. *Chemical Dynamics, Inc. v. Newfeld,* 728 S.W.2d 590 (Mo.Ct. App.1987). If Fleisher had indeed rejected this opportunity on behalf of HFE, BFI would have no expectancy in reduced administrative costs. Since the harm alleged by BFI is simply a lack of profit, there is a question as to whether Bridgeman breached his fiduciary duty by not sharing this profit with BFI.

---

**14.** "One who fails to disclose to another a thing which he knows may justifiably induce the oth- er ..." Restatement 3d of Torts § 551(1) at 117.

Similarly, although Bridgeman used the same office, furniture, and management staff for both BFI and Foods II, HFE has not presented any evidence to show that this harmed it directly. It was argued that Bridgeman's failure to consult the shareholders before making these changes resulted in another breach of his fiduciary duties. In the past, however, Bridgeman and Fleisher had made personnel or administrative changes in the corporation without consulting HFE's shareholders, such as hiring Paul Thompson as manager of the five BFI restaurants. Bridgeman has testified that Fleisher used Fragnito, HFE's employee, to help set up other businesses. In the absence of a provision in BFI's articles of incorporation which would empower the shareholders to participate in making ordinary business decisions, the Court must conclude that Bridgeman was not duty-bound to obtain shareholder approval for anything but major corporate changes.

A director will not be held accountable under the corporate opportunity doctrine if he acted in good faith. *Bump Pump v. Waukesha Foundry Co.*, 238 Wis. 643, 300 N.W. 500 (1941). The defendant has presented facts which tend to show that he acted in good faith. He offered an opportunity to the only shareholder in BFI with whom he had contact, and stated that Fleisher unequivocally rejected this opportunity. He can argue that he is not competing with BFI's five Wendy's, since the restaurants are geographically dispersed; in any case, HFE has not argued that its stores are losing money as a result of Bridgeman's "competition." HFE has claimed that it has not benefitted from the expansion, but it has not shown that it has suffered due to Bridgeman's alleged breach of duty. Its only argument is that it should have been permitted to expand along with Bridgeman.

The facts set forth by HFE in support of its claim could just as easily be interpreted in Bridgeman's favor. For example, the fact that Bridgeman hoped to reduce costs by running a twenty-one store operation as opposed to a five store operation could support a finding that he hoped to involve HFE or its shareholders in the venture until Fleisher rejected his proposal. There is evidence in the record that Fleisher was consulted throughout Bridgeman's negotiations with Wendy's and lost enthusiasm as Wendy's refused to compromise on its terms. Moreover, there was the possibility that Wendy's would have refused to close on the transaction when it found out that HFE and Larry Fleisher were involved in BFI. Fleisher himself hid his involvement in BFI from Wendy's so the original five store deal could be completed and apparently believed that his relationship with Wendy's had soured to the extent that any future business ventures would be impossible. From the facts presented, the Court finds that a reasonable jury might be able to bring back a verdict in the defendant's favor and therefore cannot grant the plaintiff's motion for summary judgment.

## V. CONCLUSION

For the reasons set forth herein, the Court DENIES the plaintiff's motion for summary judgment.

SO ORDERED.