CSFM CORPORATION, formerly known as Chicago Steel Corporation, a Wisconsin corporation, and FM Properties of Wisconsin, Inc., Plaintiffs,

v.

ELBERT & McKEE COMPANY, a partnership, William W. McKee, Jr., Phillip O. Elbert, Raymond Jasica, Chicago Steel Corporation, an Illinois corporation, Defendants.

No. 87 C 8495.

United States District Court,
N.D. Ill.,
Eastern Division.

Nov. 2, 1994.

John J. Voortman, Alana L. Helverson, Edward J. Finn, Schiff, Hardin & Waite, Chicago, IL, for plaintiffs.

Stephen Novack, Donald A. Tarkington, Novack & Macey, Chicago, IL, for defendants.

## ORDER

LINDBERG, District Judge.

Having reviewed *de novo* the objected to portions of Magistrate Judge Pallmeyer's report and recommendation, the court overrules the objections and accepts the report and recommendation. The parties' cross-motions for summary judgment on count one are denied.

### *REPORT AND RECOMMENDATION: COUNT I*[1]

Plaintiffs in this case are FM Properties of Wisconsin, Inc. and its wholly-owned subsidiary CSFM[2] Corporation (originally Chicago Steel Corporation). FM Properties is a wholly-owned subsidiary of First Wisconsin National Bank ("FWNB"). FM Properties created CSFM to acquire and hold the assets of a steel fabrication plant in Melrose Park, Illinois, when the former owner of the plant defaulted on a loan from FWNB.

Defendants are Phillip O. Elbert, William W. McKee, their partnership of Elbert & McKee Company, their colleague Raymond Jasica, and their wholly-owned corporation Chicago Steel Corporation. Plaintiffs are suing Defendants for breach of fiduciary duty (Count I) and breach of contract (Count II) 870 F.Supp. 841. Plaintiffs' claims arose out of Defendants' purchase of the Melrose Park steel plant and its assets from Plaintiffs and

---

1. This Report addresses the parties' cross-motions for summary judgment on Count I of the Amended Complaint. Cross-motions on Count II are addressed in a separate report also issued today.

2. The Court assumes that "CSFM" is an abbreviation for *Chicago Steel* and *FM* Properties.

Defendants' subsequent sale of the plant and assets to a third party.[3]

Both FM Properties and CSFM are Wisconsin corporations, with their principal places of business in Milwaukee, Wisconsin. At the time of the filing of the complaint, Defendants Elbert and Jasica were both citizens of Illinois and residents of the Northern District of Illinois. Defendant McKee was a citizen of Pennsylvania. Elbert and McKee (but not Jasica) were partners in Elbert & McKee Company, a consulting firm to the steel industry with its principal place of business in California. Jasica is the former president of Chicago Steel/CSFM. Defendant Chicago Steel Corporation (here, Chicago Steel/Illinois) is incorporated in Illinois and has its principal place of business in Illinois.

This case is properly before the federal court under its diversity jurisdiction. All Plaintiffs are citizens of different states from all Defendants, and the amount in controversy is in excess of $50,000, exclusive of interest and costs. 28 U.S.C. § 1332(a) (1994).

## PROCEDURAL HISTORY

Plaintiffs filed their initial Complaint on September 29, 1987 and an Amended Complaint on February 11, 1988, in which they alleged that Defendants had breached fiduciary duties (Count I) and contractual duties (Count II) owed to Plaintiffs.[4] Defendants subsequently filed a motion to dismiss Plaintiff's Count I.

Judge Suzanne Conlon, to whom the case was then assigned, denied Defendants' motion to dismiss Count I. *CSFM Corp. v. Elbert & McKee Co.*, No. 87 C 8495, 1988 WL 93957, 1988 U.S.Dist. LEXIS 9993 (N.D.Ill. 1988). The threshold issue in Count I, according to Judge Conlon, was when Defendants' fiduciary duties to Plaintiffs ended; specifically, whether Defendants' duties ended in August 1986 when the parties signed an agreement to sell the steel plant and all of its assets to Defendants, or in December 1986 when the parties closed the deal and ownership of the assets actually passed to Defendants. *Id.* 1988 WL 93957 at *2.

Judge Conlon concluded that the August 1986 agreement did not terminate Defendants' fiduciary duties. The agreement was a contract to buy and sell, nothing more. *Id.* 1988 WL 93957 at *3. Judge Conlon based her conclusion in part on the general rule under Wisconsin law that officers of a corporation may not, by contract, lawfully divest themselves of their fiduciary obligations.[5] *Id.* 1988 WL 93957 at *3.

After denial of their motion to dismiss, Defendants filed an answer to the complaint and affirmative defenses to the breach of fiduciary duty and breach of contract claims. In November 1989, both parties moved for summary judgment on both Counts I and II. On March 2, 1994, the parties' motions were referred to these chambers pursuant to Local Rule 2.41(b).

## FACTUAL BACKGROUND: COUNT I

The following factual background is supported by the parties' Local Rule 12(m) and 12(n) statements.[6] Citations are also provid-

---

**3.** The Melrose Park steel plant and its assets changed hands three times during the time period relevant to this case, with the name "Chicago Steel Corporation" assumed by each new owner. For the sake of clarity and consistency with the parties' briefs, this Court will use the term "Chicago Steel/CSFM" to refer to the plant when owned by the Plaintiffs; "Chicago Steel/Illinois" to refer to the Defendants' corporation, which purchased the plant from Plaintiffs; and "Chicago Steel/PDM" to refer to the plant when it was purchased by and merged with Pitt–Des Moines, Inc.

**4.** In their Amended Complaint the Plaintiffs added a third count to seek injunctive and declaratory relief regarding the preservation and produc-

tion of certain financial documents. Judge Lindberg later dismissed Plaintiffs' Count III. *CSFM Corp. v. Elbert & McKee Co.*, No. 87 C 8495 (N.D.Ill. Dec. 19, 1990).

**5.** In their motion and briefs before this Court, the Defendants contend that case law decided after Judge Conlon's decision does authorize fiduciaries to terminate their duties by contract. This issue is a major source of conflict between the parties and will be discussed at length in the following section.

**6.** Under the local rules in effect at the time, the parties filed some of their materials as Rule 12(*l*) statements. This Report will use the current nomenclature.

ed to other materials relied upon by the parties.

First Wisconsin National Bank (FWNB) and its wholly-owned subsidiary FM Properties, Inc. acquired the assets of a steel fabricating plant located in Melrose Park, Illinois through a deed in lieu of foreclosure when the plant's former owner proved unable to repay a loan to FWNB. (Plaintiffs' Rule 12(m) Statement on Count I, ¶¶ 7, 10.) FM Properties created a wholly-owned subsidiary, Chicago Steel Corp. (here Chicago Steel/CSFM) to hold the assets.

## A. Roles of Elbert, McKee, and Jasica

FWNB had no experience in the operation of a steel plant. Accordingly, in October 1984, FWNB entered into an Agreement for the Performance of Personal Services (hereinafter "Personal Services Agreement") with the consulting firm of Elbert & McKee Company.[7] (Plaintiffs' Rule 12(m) Statement on Count I ¶ 11.) The Agreement provided that Elbert and McKee would serve initially as chief executive officers of Chicago Steel/CSFM with the authority, subject to Board approval, to formulate company policies; administer the company; hire and fire personnel; and enter into contracts. (Personal Services Agreement § 1, Ex. PX–2 to Plaintiffs' Rule 12(m) Statement on Count I.) Specifically, Elbert and McKee would serve as President and Executive Vice President, or in any other executive officer position designated by the company's Board of Directors. (Id.)

The Board of Directors formally elected Elbert and McKee to their respective positions on October 2, 1984 (Plaintiffs' Rule 12(m) Statement on Count I ¶ 13) and filed notice to this effect with the Wisconsin Secretary of State on October 22. (Chicago Steel Corporation Certificate of Newly Elected Officers/Directors of 10/22/84, Ex. PX–24 to Plaintiffs' Rule 12(m) Statement on Count

I.) Thereafter, the minutes of the board meetings consistently listed Elbert and McKee among the "officers present." (See, e.g., Minutes of monthly meetings of Chicago Steel/CSFM's Board of Directors (hereinafter "Board Minutes") of 1/15/85 through 11/14/86, Ex. PX–30–39, PX–42–45, PX–52, PX–68, PX–151, and PX–154 of Plaintiffs' Rule 12(m) Statement on Count I.)

Plaintiffs claim they understood from the beginning that Elbert and McKee were to run the company. (Ehle Dep.[8], at 133–139, 167–169.) They further contend that the personnel of FWNB and the directors of Chicago Steel/CSFM and FM Properties believed that Elbert and McKee were officers of the company and relied upon them as such. (Plaintiffs' Rule 12(m) Statement ¶ 20; Stark Dep.[9], at 201.) In addition, in a letter from Defendants' own attorney John Jeffries to Edwin Hochman, Vice President of Near North Insurance Agency, Jeffries described Defendants Elbert and McKee as being "in charge of operations of Chicago Steel Corporation. . . ." (Letter from Jeffries to Hochman of 11/1/85, Ex. PX–206 to Plaintiffs' Rule 12(m) Statement on Count I.) Jeffries went on to write that Elbert and McKee were involved in "managing" other steel facilities across the United States and would likely acquire Chicago Steel/CSFM by the second quarter of 1986. (Id.)

Defendants Elbert and McKee, however, strongly deny they were officers of Chicago Steel/CSFM. They assert that they repeatedly refused to serve as officers or employees of Chicago Steel/CSFM because to have done so would have harmed their business as independent consultants to the steel industry. (Elbert Dep., at 205–107; McKee Dep., at 122–24; Elbert Aff. ¶ 7; McKee Aff. ¶ 6.) They further contend that their initial appointments as President and Executive Vice President were intended solely to meet certain technical incorporation requirements

---

7. The parties dated the agreement October 1, 1984 but did not actually sign it until 1985. (Plaintiffs' Rule 12(m) Statement on Count I ¶ 11.) The parties do not dispute that the agreement was binding during the relevant time period,

8. Frederic Ehle was First Vice President of First Wisconsin National Bank and a Director of Chicago Steel/CSFM.

9. Robert Stark was Assistant Vice President of First Wisconsin National Bank and frequently attended meetings of the Board of Directors of Chicago Steel/CSFM.

and thus were not substantive positions. (Elbert Aff. ¶ 4; McKee Aff. ¶ 4.) In addition, McKee denies knowing he was included in the list of "officers present" in the board minutes (McKee Dep., at 140), and both he and Elbert deny knowing of the election notice filed with the Wisconsin Secretary of State's office. (Elbert Aff. ¶ 4; McKee Aff. ¶ 4.) [10]

Despite their objections, the record shows that Defendants did perform a number of important managerial tasks for Chicago Steel/CSFM. These tasks, which were consistent with if not necessarily specified in the Personal Services Agreement, included assisting Plaintiffs in finding a buyer for the company (Letter from Elbert to Ehle on 12/12/84, Ex. PX–27 to Plaintiffs' Rule 12(m) Statement on Count I; Elbert Aff. ¶ 8.); reporting regularly to the company's Board of Directors on the status of various projects and bids for contracts (Board Minutes of 1/15/85 through 11/14/86, Ex. PX–30–39, PX–42–45, PX–52, PX–68, PX–151, and PX–154 of Plaintiffs' Rule 12(m) Statement on Count I); and signing checks drawn on the company's account with FWNB. (Board Minutes of 3/14/85, Ex. PX–32 to Plaintiffs' Rule 12(m) Statement on Count I.) [11]

More significantly, in late 1984 Elbert and McKee recruited Raymond Jasica to be the company's President and Chief Executive Officer—the "highest level full-time employee of the Chicago Steel Company," in Elbert's words. (Letter from Elbert to Jasica of 11/4/84, Ex. DX–16 to Plaintiffs' Rule 12(m) Statement on Count I.) In a letter to Jasica on November 4, Elbert wrote that he, Jasica, and McKee would initially serve as an executive committee for Chicago Steel/CSFM, make the necessary decisions, and then divide up the assignments. (*Id.*)

On December 1, 1984, the Board of Directors elected Jasica President of Chicago Steel/CSFM and removed Elbert and McKee from their positions as president and executive vice president. (Chicago Steel Corporation Directors' Consent Action of 12/1/84, Ex. PX–21 to Plaintiffs' Rule 12(m) Statement on Count I.) At the same time, the Board elected McKee and Elbert to the newly created position of "Vice Chairman." (*Id.*) Defendants Elbert, McKee, and Jasica remained in these respective positions for the remainder of the time they were employed by Chicago Steel/CSFM. (Plaintiffs' Rule 12(m) Statement ¶ 15.)

As stated above, Defendants Elbert and McKee assert that they were not officers of Chicago Steel/CSFM and claim that the position of "Vice Chairman" was a purely nominal title. (Elbert Dep., at 205–207; McKee Dep., at 122–124; Elbert Aff. ¶ 6; McKee Aff. ¶ 5.) Defendants do not offer any evidence, however, that Jasica's role as President and CEO of Chicago Steel/CSFM was anything but substantive.

## B. Defendants Were Aware That Plaintiffs Wanted to Sell Chicago Steel/CSFM

The record shows that from a time early in their relationship with Plaintiffs, Defendants were aware that Plaintiffs wanted to sell the Melrose Park steel plant. In their initial offer to serve as consultants, Elbert wrote that he and McKee were uniquely qualified to determine whether the plant could be sold as an operating company. (Letter from Elbert to Pattinson [12] of 7/30/84, Ex. PX–20 to Plaintiffs' Rule 12(n) Reply on Count I.) In December 1984, Defendants offered to assist FWNB in finding a buyer, which Defendants recognized was the Bank's "primary thrust."

---

10. Elbert, however, admits he received copies of the board minutes but never objected to being listed as an officer. (Elbert Dep., at 203–204, 207, 210.)

11. The parties disagree as to whether Defendants also were supposed to provide expert advice on the value of Chicago Steel/CSFM's assets. Plaintiffs contend Defendants did have such a duty (Plaintiffs' Rule 12(m) Statement on Count I ¶¶ 8, 9, 24; Ehle Dep., at 97, 109–110; Pattinson Dep., at 92–94; Stark Dep., at 221), while Defen-

dants deny this was their responsibility (Elbert Dep., at 98, 115, 116–117; Elbert Aff. ¶ 2; McKee Aff. ¶ 2; Jasica Aff. ¶ 3) or that they provided anything more than informal assessments of the company's worth. (Elbert Dep., at 115–116; McKee Dep., at 79–80.) As will be discussed later, this Court does not believe this question is material to resolving Count I.

12. William Pattinson was First Vice President of First Wisconsin National Bank.

(Letter from Elbert to Ehle on 12/12/84, Ex. PX–27 to Plaintiffs' Rule 12(m) Statement on Count I; *see also* Elbert Aff. ¶ 8.) Both Elbert and McKee contacted a number of potential buyers in the steel industry (McKee Dep., at 128–134), and Elbert described the prospects for the sale of the company to the Board of Directors on several occasions. (Board Minutes of 1/15/85 and 2/19/85, Exs. PX–30 and PX–31, respectively, to Plaintiffs' Rule 12(m) Statement on Count I.)

## C. *Defendants' Purchase of Chicago Steel/CSFM*

Defendants eventually decided to purchase the assets of Chicago Steel/CSFM themselves. In March 1985 Defendants notified Plaintiffs of their interest (Board Minutes of 3/14/85, Ex. PX–32 to Plaintiffs' Rule 12(m) Statement on Count I), and in March 1986 sent a letter of intent offering to purchase the stock of Chicago Steel/CSFM from Plaintiffs. (Letter from Elbert, McKee, and Jasica to First Wisconsin National Bank of 3/12/86, Ex. PX–46 to Plaintiffs' Rule 12(m) Statement on Count I.)

Defendants assert that from the time they first expressed interest in purchasing the company, it was understood by all parties that they were in a potentially adversarial relationship. (Defendants' Rule 12(m) Statement on Count I ¶¶ 8–11.) Defendants further claim that Plaintiffs subsequently took steps to protect their interests and verify any representations made by Defendants, such as obtaining outside appraisals of the property; actively searching for other potential buyers; requiring monthly financial reports from Defendants; and prohibiting Defendants from binding Chicago Steel/CSFM or entering into any contracts on its behalf. (Defendants' Rule 12(m) Statement on Count I, at 14.)

Defendants also contend that during this time Plaintiffs had identified another prospective buyer interested in purchasing Chicago Steel/CSFM's assets. (Defendants' Rule 12(m) Statement on Count I ¶¶ 47, 48.) Defendants claim this other buyer was willing to pay significantly more than what was paid by Defendants, but the record shows only that the prospective buyer offered some $3,000,000, which was comparable to what Defendants eventually paid. (Ehle Dep., at 118, 473–74, 477–79.) Moreover, the record shows that the buyer entered at the "eleventh hour" of Plaintiffs' negotiations with Defendants, and Plaintiffs put the second buyer on hold pending resolution of their negotiations with Elbert, McKee, and Jasica. (Ehle Dep., at 481–83.)

Plaintiffs and Defendants finally reached an agreement for the purchase and sale of Chicago Steel/CSFM. ("Purchase and Sale Agreement," found in Letter from Ehle, Fitzsimonds, and Giese [13] to Elbert, McKee, and Jasica of August 19, 1986, Ex. PX–5 to Plaintiffs' Rule 12(m) Statement on Count I.) [14] The Purchase and Sale Agreement included the following terms relevant to Count I:

- The purchase price would consist of $2,500,000 payable in cash at closing; plus $1,776,000 payable in cash in closing, but which amount would be decreased (or increased) by any amounts received by (or from) FWNB from (or to) the Buyers prior to closing; plus 1,500,000 shares of preferred stock, par value of $1.00 per share, in the new corporation. (*Id.* ¶¶ 1(a–c).)
- The closing of the purchase and sale was scheduled for December 15, 1986. (*Id.* ¶ 5.)
- Either Buyers or Seller could terminate the agreement in the event that Buyers failed to obtain a financing commitment by October 15, 1986 or otherwise failed

---

**13.** Roger Fitzsimonds was the Chairman of the Board of Chicago Steel/CSFM. Louis Giese was the Executive Vice President of FM Properties of Wisconsin, one of the Plaintiffs. Frederic Ehle, as noted previously, was a First Vice President of First Wisconsin National Bank and a Director of Chicago Steel/CSFM.

**14.** Technically it was an agreement of the Seller Chicago Steel Corporation (here Chicago Steel/

CSFM) and its Stockholders, FM Properties and its parent corporation First Wisconsin National Bank, to sell the assets of the Seller to Elbert, McKee, and Jasica, *either individually and/or to a corporation formed by them for this purpose.* (Purchase and Sale Agreement, Ex. PX–5 to Plaintiffs' Rule 12(m) Statement.) The Agreement referred collectively to Elbert, McKee, Jasica, and their corporation as the Buyers.

to purchase the company by December 15, 1986. (*Id.* ¶ 10.)

- From the period of time covering the signing of the agreement to the final closing of the sale, Plaintiffs could not seek to sell, sell, or permit the sale of Chicago Steel/CSFM to another buyer, unless one or both parties terminated the agreement as provided above. (*Id.* ¶ 7.)

On or about October 15, 1986, Defendants obtained a financing commitment from American National Bank ("ANB") for $4,500,000, consisting of a $3,500,000 term loan and a $1,000,000 revolving line of credit. (Plaintiff's Rule 12(m) Statement on Count I ¶ 30; Letters from American National Bank to Elbert, McKee, and Jasica of 9/23/86 and 10/8/86, Exs. PX–69 and PX–100, respectively, to Plaintiffs' Rule 12(m) Statement.) It was unclear, however, whether ANB's financing would be sufficient to close the deal; Defendants planned to rely on the plant's income and assets to purchase the company, but the plant was experiencing a cash shortfall. (Plaintiffs' Rule 12(m) Statement on Count I ¶¶ 30, 31.) Defendants contend Plaintiffs had anticipated the shortfall and had agreed to provide any additional financing required to close the deal. (Defendants' Rule 12(m) Statement on Count I ¶¶ 44–46; Elbert Dep., at 294–95.)

Whatever the understanding of the parties, FWNB did loan Defendants some $1,500,000 in October and November of 1986 in order to proceed with the transaction. (Plaintiffs' Rule 12(m) Statement on Count I ¶¶ 30, 31; Chicago Steel Corporation Directors' Consent Action of 10/5/86, Ex. PX–71 to Plaintiffs' Rule 12(m) Statement; Letter from Schulz to Elbert of 11/26/86, Ex. PX–81 to Plaintiffs' Rule 12(m) Statement on Count I.) In addition, on December 11, 1986, the parties determined that FWNB would also have to provide a short-term note for $2,800,000 to Defendants. (Plaintiffs' Rule 12(m) Statement on Count I ¶ 33; Ireland Dep., at 505–506; Jasica Dep., at 187–206.) A dispute between FWNB and ANB over the security

for FWNB's loan delayed the closing until the next day. (Plaintiffs' Rule 12(m) Statement on Count I ¶ 34; Stark Dep., at 773.)

Plaintiffs and Defendants finally closed the purchase and sale on December 12, 1986. (*Id.*) Although the closing occurred nearly two months after the deadline agreed upon by the parties by which Defendants were to have secured financing, neither side had taken advantage of the financing contingency in the Purchase and Sale Agreement to terminate the deal.

### D. Defendants' Negotiations with PDM Prior to Closing

While engaged in negotiations with Plaintiffs in 1986, Defendants also were having discussions with senior officials of Pitt–Des Moines, Inc. ("PDM") about employment prospects and a possible sale of the company's assets. During the previous several years, Elbert and John Long, Chairman and Chief Executive Officer of PDM, had had discussions about PDM's management needs. (Plaintiffs' Rule 12(m) Statement on Count I ¶ 38.) PDM faced serious managerial problems; in particular, the major active directors of PDM were all in their seventies or eighties; PDM's financial condition was deteriorating rapidly; and its directors were unhappy with the company's current management. (Plaintiffs' Rule 12(m) Statement on Count I ¶ 38; Long Dep., at 3, 18–20; Jackson Sr. Dep., at 3; Paddock Dep., at 3, 9.) [15]

Elbert and Long discussed this situation on October 22 and 23, 1986, only one week after Defendants were supposed to have met their financing commitment to Plaintiffs. (Plaintiffs' Rule 12(m) Statement on Count I ¶¶ 38, 39.) At that time Elbert told Long that "PDM and Chicago Steel complemented each other." (*Id.*) The two men discussed proposals ranging from joint ventures and other business arrangements between their two companies to having McKee and Elbert go to work for PDM. (Elbert Dep., at 302–307.) Indeed, at about that same time, Long asked Elbert whether Defendants would be available to work for PDM. (Long Dep., at

---

**15.** W.R. Jackson, Sr. was Chairman of PDM's Board of Directors. Austin Paddock was a Director and a Member of PDM's Executive Committee. Long, as mentioned in the text, was Chairman and Chief Executive Officer of PDM.

17–18.) Defendants advised Long and other PDM officials, however, that they were contractually obligated to purchase and manage Chicago Steel, and even if they wanted to work for PDM they would be unable to do so because they would be involved in running their own new corporation. (Jackson Sr. Dep., at 6–7, 10.) At some later time, Defendants advised PDM they would consider becoming employees if and only if PDM were to purchase Chicago Steel. (Paddock Dep., at 16–17; Jackson Dep., at 6–7.)

Discussions between PDM and Defendants continued through November and December of 1986. On November 5, W.R. Jackson, Sr., Chairman of the Board of PDM, met with one or more of Defendants to discuss the acquisition, including the terms under which Defendants would come to work for PDM; the amount of business that Chicago Steel/CSFM had secured; an appraisal of the plant's value; what Chicago Steel/CSFM's future business might look like; and how much profit Defendants expected Chicago Steel/CSFM to make that year. (Jackson Dep., at 50–51.) In November and early December of 1986, Defendants sent Jackson and other PDM officials detailed information on Chicago Steel/CSFM's financial situation, including its financial statements, an evaluation report, and an appraisal of the company's machinery, equipment, factory, and office. (*Id.;* Plaintiffs' Rule 12(m) Statement on Count I ¶ 44; Byers Dep., at 30–31, 44; Letter from Jackson Sr. to Elbert, McKee, and Jasica of 12/3/86, Ex. PX–83 to Plaintiffs' Rule 12(m) Statement on Count I; Memo from Zervins to Byers of 11/26/86, Ex. PX–171 of Plaintiffs' Rule 12(m) Statement on Count I.) During this time Jackson told Richard Byers, PDM's Vice President for Finance, that PDM was considering "buying a fabrication plant so we can bring management down to PDM" and mentioned Defendants by name. (Byers Dep., at 30–31.)

Defendants assert that prior to the time they purchased Chicago Steel/CSFM's assets from Plaintiffs, they "did not believe" PDM would purchase the company's stock or assets. (Elbert Aff., ¶ 3; McKee Aff., ¶ 3; Jasica Aff. ¶ 4.)[16] Plaintiffs note, however, that on December 19, 1986, only one week after closing the sale, five high-ranking PDM officials—W.R. Jackson, Sr.; John H. Long; Austin Paddock; W.R. Jackson, Jr., President and member of the Executive Committee; and Royce Northcutt, President of Operations of PDM—all traveled to Illinois to inspect the company's fabricating facility. (Long Dep., at 27–28; Jackson, Sr. Dep., at 11–13.)

**E. *Defendants Did Not Inform Plaintiffs of Their Negotiations with PDM***

At no time prior to their purchase of Chicago Steel/CSFM's assets did Defendants inform Plaintiffs of their negotiations with PDM. (Elbert Dep., at 352; McKee Dep., at 211; Jasica Dep., at 198.) Defendants argue that PDM was interested solely in securing the services of Elbert, McKee, and Jasica (Defendants' Memorandum in Support of Motion for Summary Judgment on Count I of Plaintiffs' Complaint (hereinafter "Defendants' Memorandum I", at 3–6.)); thus, there was no need to inform Plaintiffs because PDM would not have purchased the company directly from them.

Defendants assert that PDM had no interest in acquiring another steel fabrication plant at that time, due to poor market conditions, PDM's weak financial situation, and the unused capacity of its existing plants. (Long Dep., at 17–18, 23; Jackson Dep., at 9, 33; Paddock Dep., at 11, 22, 23.) Nonetheless, PDM's directors believed the company needed management help because its financial situation was deteriorating rapidly. (Paddock Dep., at 9.) Consequently, according to Defendants, PDM decided that pur-

---

**16.** Defendants also claim that Jasica was not even aware of PDM's interest in purchasing Chicago Steel/CSFM. (Defendants' Rule 12(m) Statement on Count I ¶ 23.) The record does not show that Jasica was *unaware* of PDM's interest, however, only that he did not *believe* that PDM would purchase Chicago Steel/CSFM. (Jasica Aff. ¶ 4.) Moreover, at least some hearsay evi-

dence contradicts Defendants' contention: John Long testified that on October 24, 1986, Elbert told him that Elbert had talked to McKee and Jasica about PDM's interest, and they told Elbert at the time that they were interested in going to work for PDM if PDM could transact the purchase of the company. (Long Dep., at 20–21.)

chasing Chicago Steel was an evil necessary to secure the services of Elbert, McKee, and Jasica. (Defendants' Rule 12(m) Statement on Count I ¶¶ 19, 20; Paddock Dep., at 22–23; Jackson Dep., at 10–11, 21–22, 26, 33; Long Dep., at 23–24, 35–36.) Defendants repeatedly emphasize that but for the opportunity to employ Defendants, PDM would not have purchased Chicago Steel/CSFM. (Defendants' Rule 12(m) Statement on Count I ¶ 21; Paddock Dep., at 22–23; Jackson Dep., at 10–11, 21–22, 26, 33; Long Dep., at 23–24, 35–36.)

Plaintiffs contend, however, that PDM may have been interested in acquiring Chicago Steel/CSFM's plant for its own sake; thus, had Plaintiffs been timely informed of PDM's interest, Plaintiffs may have been able to sell the company directly to PDM or as part of a three-party transaction involving Defendants as well. (Plaintiffs–Counterdefendants' Memorandum in Opposition to Defendants–Counterplaintiffs' Motion for Summary Judgment on Count I (hereinafter "Plaintiffs' Opposition I"), at 3.) To support this claim, Plaintiffs point out that in a November 1986 telephone conversation, Jackson told Elbert that "we (PDM) really need to get into the erection business ... (and) that is a very good fit for us and for you." (Transcript of Phone Conversation of Jackson Sr. and Elbert of 11/18/86, Ex. PX–76 to Plaintiffs' Rule 12(m) Statement on Count I.[17]) Moreover, Plaintiffs contend that Chicago Steel/CSFM's plant was more efficient and better able to serve the Chicago area than any of PDM's existing facilities. (Long Dep., at 104; Jackson Sr. Dep., at 108; Jasica Dep., at 221.) Plaintiffs also observe that in 1987, the same year PDM purchased Chicago Steel/Illinois, PDM purchased another plant in California, suggesting that PDM's purchase of Defendants' company may have been at least partially unrelated to Defendants' services. (Plaintiffs' Opposition I, at 6; Jackson Sr. Dep., at 29.) Plaintiffs admit, however, that there is no way to surmise what might have happened had they been informed of PDM's interest. (Fitzsimonds Dep., at 230–232.)

Defendants take issue with all of Plaintiffs' assertions. With respect to the supposed efficiency of Chicago Steel/CSFM's plant, Defendant respond that PDM viewed the plant as outdated but run efficiently by Defendants. (Id. at 10; Jackson Sr. Dep., at 120–121; Paddock Dep., at 14–15.) Moreover, Defendants contend that PDM's purchase of the California facility was not motivated by any desire to expand PDM's operations. Rather, PDM purchased the California plant merely to replace an aging facility; to take advantage of the older plant's high property value; and to obtain skilled managers for PDM in the same way that PDM had obtained Defendants' services by purchasing Chicago Steel/Illinois. (Defendants' Reply Memorandum in Support of Defendants' Motion for Summary Judgment on Count I, (hereinafter "Defendants' Reply I"), at 9.) Thus, Defendants insist that PDM was interested solely in employing Defendants and would not have purchased the plant from Plaintiffs under any circumstances. (Id.)

## F. Defendants' Final Negotiations and Sale to PDM

By January 27, 1987, PDM sent Defendants a letter of intent recording an understanding among the parties of the terms by which PDM would acquire the assets of and merge with Chicago Steel/Illinois. (Letter from Jackson Sr. to Elbert of 1/27/87 and Letter of Intent, Ex. PX–102 to Plaintiffs' Rule 12(m) Statement.) PDM and Defendants closed the deal on April 15, 1987 when PDM acquired all of Defendants' stock in Chicago Steel/Illinois. (Defendants' Rule 12(m) Statement on Count I ¶ 39.)

Plaintiffs contend that Defendants sold Chicago Steel/Illinois to PDM at a substantial profit. (Plaintiffs' Brief in Support of Motion for Summary Judgment on Count I (hereinafter "Plaintiffs' Brief I"), at 2, 9–10.) PDM gave Defendants 119,949 shares of PDM stock, valued at nearly $2.8 million, in exchange for all of their stock in Chicago Steel/Illinois. (Id. at 9–10.) PDM also paid the outstanding balance of Chicago Steel/Illi-

---

**17.** At the time Jackson believed the conversation was important and recorded it using his hand- held recorder.

nois' debt to CSFM on or about the time of the closing. (Plaintiffs'· Rule 12(m) Statement on Count I ¶¶ 55, 56; McKee Dep., at 54–56; Jasica Dep., at 265–66; Elbert Dep., at 67–68.) Defendants did not at any time put any of their own money into the company. (*Id.;* Elbert Dep., at 325–326; McKee Dep., at 48, 59–60; and Jasica Dep., at 265–266.)

Defendants insist that any premium paid by PDM to purchase Chicago Steel/Illinois reflected solely PDM's desire to secure the employment of Elbert, McKee and Jasica. (Defendants' Rule 12(m) Statement on Count I ¶ 26; Byers Dep., at 114–115.) Defendants note, for example, that as a condition to purchasing Chicago Steel/Illinois, PDM insisted on and received five-year employment contracts from Elbert, McKee, and Jasica. (Defendants' Rule 12(m) Statement ¶ 40; Jasica Aff. ¶ 7.) Their contracts required that they devote 100% of their time to PDM; terminate any outside consulting ventures; and abstain from engaging in any other regular business activity. (*Id.*) In fact, shortly after their employment with PDM, Elbert was made Chairman of the Board of PDM, McKee was made President and Chief Executive Officer of PDM, and Jasica was made President of PDM's Structural Group. (Defendants' Rule 12(m) Statement on Count I ¶ 41.) Both Elbert and McKee were also promoted to PDM's Executive Committee. (*Id.*)

## DISCUSSION: COUNT I

In Count I, Plaintiffs claim that Defendants breached their fiduciary duties by failing to inform Plaintiffs of their negotiations with PDM, thus depriving Plaintiffs of a potential business opportunity to sell Chicago Steel/CSFM directly to PDM or as part of a three-party transaction. In Count II, Plaintiffs claim that Defendants breached the August 1986 Purchase and Sale Agreement by failing to provide Plaintiffs with an appropriate share of the proceeds from the sale of Chicago Steel/Illinois to PDM, as provided in ¶ 1(d) of the Agreement. Both parties have moved for summary judgment on Count I (breach of fiduciary duty) and Count II (breach of contract).

Before delving into the details of the cross-motions, the Court will briefly review the legal standards for summary judgment and the relevant laws of corporations. A court will grant a motion for summary judgment when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c) (1994); *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). A genuine issue exists only if there is sufficient evidence for a reasonable jury to return a verdict favorable to the non-movant. *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510; *Valley Liquors Inc. v. Renfield Importers Limited,* 822 F.2d 656 (7th Cir.1987), *cert. denied,* 484 U.S. 977, 108 S.Ct. 488, 98 L.Ed.2d 486 (1987). Furthermore, a defendant moving for summary judgment must prevail if the plaintiff fails to establish an essential element of his/her case. *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510.

The party opposing the motion must put forth specific facts to show a genuine issue of material fact, not mere allegations of a factual dispute. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986) · quoting FED.R.CIV.P. 56(e). In other words, the non-movant "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1985). Moreover, the court is obligated to make all reasonable inferences and construe the facts in the light most favorable to the non-movant. *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513; *Matsushita Electric,* 475 U.S. at 587–88, 106 S.Ct. at· 1356.

When faced with cross-motions, as is the case here, a court must consider each party's motion separately, and each movant has the burden of presenting evidence to support its motion. *Chrysler Motors Corp. v. International Union, Allied Indus. Workers of America,* 748 F.Supp. 1352, 1357 (E.D.Wis. 1990); *Barhold v. Rodriguez,* 863 F.2d 233, 236 (2d Cir.1988). The fact that both parties have moved for summary judgment does not

necessarily mean that a dispute of material fact does not exist. *Krill v. Bauer*, 314 F.Supp. 965, 966 (E.D.Wis.1970). Furthermore, a court must extend to each party the benefits of any factual doubt when considering the other party's motion—a "Janus-like perspective" that sometimes requires denial of both motions. *Buttitta v. City of Chicago*, 803 F.Supp. 213, 217 (N.D.Ill.1992), *aff'd*, 9 F.3d 1198 (1993).

Turning now to the relevant law of corporations, courts have held that in cases involving the internal affairs of a corporation, including the fiduciary duty of officers, the court should look to the law of the state of incorporation to determine whether a party is entitled to judgment. *First National City Bank v. Banco Para El Comercio Exterior De Cuba*, 462 U.S. 611, 621, 103 S.Ct. 2591, 2597, 77 L.Ed.2d 46 (1983) (issues relating to the internal affairs of a corporation are normally determined according to the law of the state of incorporation); *Treco, Inc. v. Land of Lincoln Savings and Loan*, 749 F.2d 374, 377 (7th Cir.1984) (the law of the state of incorporation governs the fiduciary duties of corporate directors).

■ In this case, both Chicago Steel/ CSFM and FM Properties are Wisconsin corporations having their principal places of business in Wisconsin. This court will look to the laws of that state in assessing the obligations owed by Defendants to Plaintiffs. Wisconsin recognizes a "well-established common law principle" that a corporate officer or director has a fiduciary duty to exercise individual loyalty, good faith, and fair dealing when conducting corporate business. *Racine v. Weisflog*, 165 Wis.2d 184, 477 N.W.2d 326, 329 (App.1991). That an officer owes such a duty is "axiomatic," *Havlicek/Fleisher Enterprises, Inc. v. Bridgeman*, 788 F.Supp. 389, 398 (E.D.Wis.1992) (applying Wisconsin law), for the officer's fiduciary duties are derived from the "fundamental rules of agency concerning the utmost good faith and loyalty owed by a fiduciary." *Racine*, 165 Wis.2d at 190, 477 N.W.2d at 329 (cites omitted).[18]

■ One aspect of this general fiduciary duty is the "corporate (or business) opportunity doctrine," which precludes an officer or director from exploiting the use of his/her position as a corporate insider for personal gain when the benefit or gain properly belongs to the corporation. *Id.*[19] The corporate opportunity doctrine provides that an officer may pursue a corporate opportunity provided the officer first fully discloses and offers the opportunity to the corporation and the corporation rejects it. *Havlicek/Fleisher Enterprises*, 788 F.Supp. at 399. If, however, the officer fails properly to disclose and offer the opportunity to the corporation, then the officer may be in breach of his/her fiduciary duties to the corporation. *Id.*

■ In *Racine*, the court refined Wisconsin's corporate opportunity doctrine into a two-pronged factual analysis. 165 Wis.2d at 193, 477 N.W.2d at 331.[20] The first prong of the analysis requires that the factfinder determine whether the corporation had the

---

**18.** The parties have not addressed either *Racine* or *Havlicek/Fleisher Enterprises* because both cases were decided after the parties submitted their final briefs and responses on Counts I and II. This court, however, will rely on these and other recent cases that accurately set forth applicable law.

**19.** Plaintiffs also cite *Mullaney, Wells & Co. v. Savage*, 78 Ill.2d 534, 545–546, 37 Ill.Dec. 572, 578, 402 N.E.2d 574, 580 (1980) (it is a breach of fiduciary duty for a person to seize a business opportunity that rightfully belongs to his/her corporation or to compete with the corporation). (Plaintiffs' Brief I, at 5.)

**20.** The *Racine* test is derived from three tests of corporate opportunity commonly employed in Wisconsin: (1) the "corporate interest or expectancy" test, in which an officer or director is precluded from acquiring the property of a business opportunity in which the corporation has a legal or equitable interest or expectancy; (2) the "line of business" test, in which a corporate opportunity is found whenever a managing officer becomes involved in an activity intimately or closely associated with the existing or prospective activities of the corporation; and (3) the "fairness" test, in which the existence of a corporate opportunity is determined by applying ethical standards of what is fair and equitable under the circumstances. *Racine*, 165 Wis.2d at 192–93, 477 N.W.2d at 329–330; *citing Gauger v. Hintz*, 262 Wis. 333, 351–52, 55 N.W.2d 426, 435–36 (1952); *Suburban Motors v. Forester*, 134 Wis.2d 183, 193, 396 N.W.2d 351, 355 (App. 1986); and *Miller v. Miller*, 301 Minn. 207, 220, 226, 222 N.W.2d 71, 78, 82 (1974).

ability to take advantage of the opportunity presented to and seized by the director or officer. In particular, the court should consider factors such as whether the alleged opportunity was one in which the corporation had a legitimate interest or an expectancy; whether the alleged corporate opportunity was essential, necessary, or desirable to the corporation's reasonable needs and aspirations; whether the opportunity presented a potentially harmful or unfair competitive situation with respect to the corporation; and whether the corporation had the financial, technical, and other resources needed to take advantage of the opportunity. *Id.*

██ The burden of proving the existence of a corporate opportunity rests with the party challenging the conduct of the corporate officer or director. *Id.* If, for example, the plaintiff can establish that the business opportunity is reasonably related to the corporation's current purposes and activities but cannot establish that the corporation had the skills or resources to take advantage of the opportunity, then the plaintiff has not met the burden of proof. *Id.*

██ If, on the other hand, the plaintiff has met this burden, then the court proceeds with the second prong of the analysis. At this stage the burden shifts to the defending officer or director to prove that he or she did not breach any fiduciary duties. *Id.* In other words, whereas in the first prong of the analysis the factfinder examines the relationship between the corporation and the alleged corporate opportunity, in the second prong, the factfinder examines the relationship between the defending officer and the corporation. *Id.*

██ At this point, the defendant may invoke the equitable factors of good faith, loyalty, and fair dealing to establish his/her conformity with his/her fiduciary duties. In particular, the court may examine whether the opportunity places the officer in direct competition with the corporation; whether the officer gave the corporation the opportunity to decide, upon full disclosure of all pertinent facts, whether it wishes to pursue the alleged opportunity; the nature of the officer's relationship to the corporation, in-

cluding the degree of management and control of day-to-day and long-term operations; and whether the opportunity was made to the officer in the officer's personal or professional capacity. *Id.* 477 N.W.2d at 331–332. Even if a business opportunity is offered to a director personally, he still may be obligated to offer it to the corporation if it has a real interest or expectancy in the opportunity or if the director's actions may hinder or defeat the corporation's business plans. *Havlicek/Fleisher Enterprises,* 788 F.Supp. at 399.

Using the framework erected by the *Racine* court, Plaintiffs, in order to prevail on their motion for summary judgment, must show that there is no genuine issue of material fact with respect to three essential elements: (a) that Defendants were all officers of Chicago Steel/CSFM and thus owed fiduciary duties to Plaintiffs; (b) that the sale of Chicago Steel/CSFM to PDM represented a potential corporate opportunity to Plaintiffs, had they been informed of PDM's interest; and (c) that Defendants did not uphold their duties of good faith, loyalty, and fair dealing with respect to Plaintiffs.

In their opposition to Plaintiffs' motion on Count I, Defendants assert that there are genuine factual disputes with respect to each of these three elements, and thus Plaintiffs' motion should be denied. In their own motion for summary judgment, however, Defendants argue that there is no genuine issue that PDM would not have purchased Chicago Steel/CSFM directly from Plaintiffs under any circumstances. In other words, Defendants contend that Plaintiffs have failed to establish an essential element of their case. *See Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510. On this basis, Defendants assert that summary judgment should be granted in their favor.

As will be discussed below, this court recommends denial of both motions for summary judgment on Count I of Plaintiffs' Amended Complaint. Upon examining each of the three elements described above, the court concludes that neither party has met its legal burden, particularly with respect to showing that there are no genuine issues of material fact regarding the presence (or ab-

sence) of a corporate opportunity for Plaintiffs.

## A. Defendants Owed a Fiduciary Duty to Plaintiffs

As stated above, the first element Plaintiffs must establish is that Defendants were all officers of Chicago Steel/CSFM, and thus owed a fiduciary duty to Plaintiffs. To this end, Plaintiffs note that Jasica was elected President and Chief Executive Officer in December 1984 and served in that capacity for over two years, when Defendants purchased Chicago Steel/CSFM. Plaintiffs further state that Elbert and McKee were elected initially President and Executive Vice President, as provided in their Personal Services Agreement, and later elected Vice Chairman upon Jasica's appointment. During their tenures with Chicago Steel/CSFM, all three Defendants were listed as "officers" in the minutes of the board meetings.

In response, Defendants deny they were officers and assert there is at least a genuine issue sufficient to defeat Plaintiff's motion. Defendants pursue three major arguments: (1) Defendants were officers in name only and thus owed no fiduciary duties to Plaintiffs; (2) Defendants did not satisfy the legal standard for being fiduciaries, being neither in a position of superior knowledge nor of trust with respect to Plaintiffs; and (3) the August 1986 Purchase and Sale Agreement between Plaintiffs and Defendants terminated any fiduciary duties owed by Defendants to Plaintiffs.[21] For reasons set forth below, this court finds none of Defendants' arguments compelling.

### (1) Defendants' Positions as Officers Were Substantive and Not Merely Nominal

Defendants first argue that their positions as officers were in name only and thus did not give rise to any fiduciary duty to Plaintiffs. With regard to Jasica, however, the Court finds no genuine issue that he was an officer. Defendants offer no evidence that Jasica's position as President and Chief Executive Officer was anything but substantive, and Elbert himself once informed Jasica that he would be the "highest level full-time employee of Chicago Steel Company." (Letter from Elbert to Jasica of 11/14/84, Ex. DX–16 to Plaintiffs' Rule 12(m) Statement on Count I.)

■ The facts surrounding Elbert and McKee are more complicated. Defendants claim they "refused" to become officers and that their initial appointments as President and Executive Vice President were intended solely to meet certain technical incorporation requirements. Defendants further contend that their subsequent positions as "Vice Chairmen" were nominal titles only.[22] Finally, Defendants Elbert and McKee claim they were unaware of being appointed or listed as officers, and thus were not officers due to their lack of consent. (Defendant's Opposition I, at 7, citing *West Leechburg Steel Corp. v. Smitton*, 280 Mich. 180, 273 N.W. 439, 440 (1937) (a person who is elected without knowledge and who does not accept or act as an officer is not an officer).)

This court is unpersuaded. With regard to Defendants' claim that they were unaware of

---

**21.** Defendants also offered a fourth argument, that they were not fiduciaries by virtue of their Personal Services Agreement with Plaintiffs. The Agreement, they argue, did not make Elbert and McKee responsible for finding a buyer for Chicago Steel/CSFM or evaluating its assets. (Defendants' Opposition I, at 4–5.) (Jasica, they further note, was not a signatory to the Agreement and thus was not bound by it. (*Id.*)) Thus, Defendants claim they did not breach any fiduciary duty by purchasing the company and then selling it to a third party.

The court does not believe it is relevant whether Defendants were personally responsible for the evaluation and sale of Chicago Steel/CSFM. What is relevant is whether the Defendants were

aware of Plaintiffs' interest in selling Chicago Steel/CSFM, and whether, using that knowledge, they improperly appropriated a corporate opportunity for themselves. By Defendants' own admissions, there is no dispute that Defendants were aware that Plaintiffs wanted to sell Chicago Steel/CSFM. (*See, e.g.,* Letter from Elbert to Ehle on 12/12/84, Ex. PX–27 to Plaintiffs' Rule 12(m) Reply; Elbert Aff. ¶ 8.)

**22.** The Defendants also state that the Board did not create the "office" of Vice Chairman, as claimed by the Plaintiffs, only the "position" of Vice Chairman. (Defendants' Opposition I, at 7.) The Court finds this semantic distinction immaterial.

their appointments and did not consent to being officers, the court notes that the Personal Services Agreement that Elbert and McKee signed specified that they would serve as officers, and Jasica was recruited by Elbert specifically to serve as President and CEO. Regardless of their ignorance of being listed as "officers" in the board minutes or their understanding of their role, Defendants were aware of their appointments and did consent to serve as officers.

■ This court is equally unpersuaded by Defendants' contention that their positions were in name only. An "officer" is defined as a "person holding an office of trust, command, or authority" in a corporation or other institution. BLACK'S LAW DICTIONARY 1083 (6th ed. 1990). In the case of a corporation, an officer is "a person charged with important functions of management such as a president, vice president, treasurer, etc." *Id.* In this respect, both Elbert and McKee held positions of trust, command, and authority in Chicago Steel/CSFM and were entrusted with important managerial functions, such as administering and operating the company; recruiting key personnel, such as Jasica; signing checks drawn on the company's bank account; and to some extent helping Plaintiffs find a buyer for the company.

Given Defendants' knowledge of their appointments, their important managerial duties, and their positions of command and authority, there is no genuine issue that Defendants were all officers of Chicago Steel/CSFM.

#### (2) *Defendants Satisfied the Legal Standard for Being Fiduciaries*

■ Defendants' second argument is that they did not meet the legal standard to be held fiduciaries; thus, they owed no such duties to Plaintiffs. Defendants observe that a fiduciary duty arises where one party possesses superior knowledge and influence over another and occupies a position of trust. (Defendants' Opposition I, at 2, *citing CFTC v. Heritage Capital Advisory Services, Ltd.,* 823 F.2d 171, 173 (7th Cir.1987).) Furthermore, Defendants urge a fiduciary relationship must be established by evidence that is so clear, convincing, and unequivocal as to

permit but one conclusion. (Defendants' Opposition I, at 2, *citing Babray v. Carlino,* 2 Ill.App.3d 241, 276 N.E.2d 435, 441 (1st Dist. 1971).)

Defendants proceed to argue that they satisfied neither the element of knowledge nor of trust. First, Defendants allege that they were not in a position of superior knowledge or influence with respect to evaluation of Chicago Steel/CSFM's assets or its sale because they had no duties nor any expert knowledge in this area, or at least no knowledge superior to that available to Plaintiffs from other sources. (Defendants' Opposition I, at 2–3.) Secondly, Defendants contend that the parties were not in a position of trust, given that Plaintiffs were aware from the beginning of the relevant time period that Defendants were interested in purchasing Chicago Steel/CSFM for themselves and thus were Plaintiffs' potential adversaries. (*Id.* at 3–4.)

■ The court is unpersuaded by the authorities cited by Defendants. *CFTC* involved the duty owed by a commodities broker to his client, 823 F.2d at 173, a duty that is defined by contract between the parties. By contrast, the duty owed by an officer arises from the officer's position in the company, not from his/her employment contract. *See Racine,* 165 Wis.2d at 190, 477 N.W.2d at 329 (it is a "well-established common law principle" that an officer owes a fiduciary duty, which is derived from the "fundamental rules of agency"). Moreover, Defendants do not cite, nor has this court found, any case in which a Wisconsin court has limited or qualified the fiduciary duties owed by a *corporate officer* on the basis of the officer's knowledge or position of trust with respect to the company. Instead, upon a showing that a party is a corporate officer, courts traditionally impose fiduciary duties without qualification. *See, e.g., id.; Havlicek/Fleisher Enterprises,* 788 F.Supp. at 398 (it is "axiomatic" that a corporate officer owes a fiduciary duty to his/her corporation); *Summit Electric Company v. Mayrent,* 17 Ill.App.3d 545, 552, 308 N.E.2d 313, 318 (1st Dist.1974) ("A fiduciary relationship automatically exists between a corporation and an officer of the corporation.").

Furthermore, Defendants were not only officers of Chicago Steel/CSFM but were also engaged in a transaction with their principal, i.e., the purchase of the company's assets from Plaintiffs. Defendants argue that such a transaction limited, or even terminated, any fiduciary duties they owed to Plaintiffs because of the potentially adversarial relationship that such a transaction creates. The weight of case law, however, suggests just the opposite. In a series of cases not cited by either party, courts have subjected the dealings of an officer with his/her corporation to "rigorous scrutiny." *Pepper v. Litton,* 308 U.S. 295, 306, 60 S.Ct. 238, 245, 84 L.Ed. 281 (1939); *Lebold v. Inland Steel Co.,* 125 F.2d 369, 372 (7th Cir.1942), *cert. denied,* 316 U.S. 675, 62 S.Ct. 1045, 86 L.Ed. 1749 (1942); *see also McGivern v. Amasa Lumber Co.,* 77 Wis.2d 241, 252, 252 N.W.2d 371, 376 (1977) (directors and officers are held to "strict rules of honesty and fair dealing between themselves and their corporations"); *Romanik v. Lurie Home Supply Center, Inc.,* 105 Ill.App.3d 1118, 1128, 61 Ill.Dec. 871, 878, 435 N.E.2d 712, 719 (5th Dist.1982) (where officers transact business with the corporation, the duty of undivided loyalty requires that the transaction be fair and places the burden of fairness on the defendant); *Federal Mortgage Co. v. Simes,* 210 Wis. 139, 147, 245 N.W. 169, 172–73 (1932) (an officer or director may enter into a contract with her corporation, but the validity of the contract requires the "utmost candor" and "open, fair, and honest dealing"); *Farmers and Merchants State Bank v. Perry,* 186 Wis. 93, 202 N.W. 179 (1925) (officers are required to exercise absolute good faith towards the corporation and to disclose "all knowledge" with respect to a transaction affecting its interests). Moreover, the officer bears the burden of establishing his/her good faith and the transaction's inherent fairness to the corporation. *Pepper v. Litton,* 308 U.S. at 306, 60 S.Ct. at 245; *Lebold v. Inland Steel,* 125 F.2d at 372; *McGivern v. Amasa Lumber Co.,* 77 Wis.2d at 251–52, 252 N.W.2d at 376.

The court notes that a few jurisdictions might recognize an "adverse interest" exception to a party's fiduciary duty. *See, e.g., Walter v. Holiday Inns, Inc.,* 784 F.Supp. 1159 (D.N.J.1992) (hereinafter *"Walter I"*), *aff'd,* 985 F.2d 1232 (3rd Cir.1993) (hereinafter *"Walter II"*).[23] In *Walter I,* the court held that parties that are normally in a fiduciary relationship can expect that obligation to break down when the parties adopt an adverse posture to one another. 784 F.Supp. at 1168–69, *citing Fravega v. Security Savings and Loan Ass'n,* 192 N.J.Super. 213, 469 A.2d 531 (Ch.Div.1983). In particular, the court held that when one partner in a joint venture seeks to buy out the interest of another, then the parties may no longer be bound to disclose fully all relevant information. *Id.*

*Walter I,* however, does not lend strong support to Defendants' case. The court in *Walter I* also recognized that many states continue to impose the strictest fiduciary obligations upon partners even when negotiating the dissolution of the partnership. *Id.* 784 F.Supp. at 1169; e.g., *Babray v. Carlino,* 2 Ill.App.3d 241, 276 N.E.2d 435 (1971) (transaction between partners requires "full and frank disclosure"); *Miller v. Miller,* 700 S.W.2d 941, 946 (Tex.Ct.App.1985) (the purchasing partner has the "absolute duty to disclose," and to make "full and complete disclosure of all important information"). Moreover, while the Court of Appeals for the Third Circuit ultimately affirmed the district court's holding in *Walter I,* the court cast a shadow on the lower court's reliance on *Fravega. Walter II,* 985 F.2d at 1238 ("[T]he existence of persuasive authority supporting the application of fiduciary principles even when partners act as adversaries makes it likely that *Fravega* was too slender a reed on which to decide this case. . . .").

Neither *Walter I* nor *Fravega* have been cited in any cases that have come before the courts of Wisconsin or Illinois or the federal courts of the Seventh Circuit. As a court sitting in diversity jurisdiction, this court must attempt to predict how the state su-

---

**23.** Both *Walter I* and *Walter II* were decided after the parties submitted their final briefs and re-sponses on Count I.

preme court would decide this matter. *Transamerica Insurance Company v. Henry*, 904 F.2d 387, 390 (7th Cir.1990) (cites omitted). This court finds no precedent suggesting that the Supreme Court of Wisconsin has recognized or is willing to recognize an "adverse interest exception" to a party's fiduciary duty.

On the basis of the foregoing, this court concludes that Defendants' duties arose from their positions as officers in Plaintiff's corporation, not from the Personal Services Agreement signed by Elbert and McKee or any other contractual arrangement. Defendants' duties were not dependent on their relative knowledge or trust with respect to Plaintiffs, nor were Defendants' duties limited by their negotiations to purchase the assets of Chicago Steel/CSFM. Instead, Defendants, as officers of the company, continued to owe Plaintiffs a fiduciary duty until they terminated their relationship with Plaintiffs by purchasing the company in December 1986.

### (3) *Defendants' Fiduciary Duties Were Not Terminated by the August 1986 Purchase and Sale Agreement*

■ In their third and last argument to avoid their fiduciary duties, Defendants contend that their August 1986 Purchase and Sale Agreement with Plaintiffs terminated any fiduciary duties owed to Plaintiffs. Defendants state that the nature of a fiduciary duty may be modified by a contract between the parties.[24] (Defendants' Opposition I, at 7–8, *citing DeRance, Inc. v. PaineWebber, Inc.*, 872 F.2d 1312, 1322 (7th Cir.1989); *Rendl v. Anderson*, 103 Ill.App.2d 255, 262, 242 N.E.2d 767, 772 (2d Dist.1968); and *Chipser v. Kohlmeyer*, 600 F.2d 1061, 1066 (5th Cir.1979).) In this case, Defendants argue that the Purchase and Sale Agreement terminated Defendants' fiduciary duties for two reasons:[25]

(a) Under the Agreement, Defendants assumed all of the risks and benefits of ownership of Chicago Steel/CSFM as of August 19, 1986 and were authorized to sell the company to a third party. Thus, Defendants did not breach any duty by selling the company to PDM without disclosure.

(b) The Agreement precluded Plaintiffs from selling Chicago Steel/CSFM to any party other than Defendants. Thus, Defendants' failure to disclose their negotiations with PDM did not breach any duty because Plaintiffs were obligated to sell the company to Defendants anyway.

Before addressing the terms of the Agreement itself, the court will review the case law cited by Defendants. Again, the court finds Defendants' authorities distinguishable from this case. None of the cases cited by Defendants involved a fiduciary relationship between an officer and his/her corporation. Instead, both *DeRance* and *Chipser* involved the duties owed by a commodities or securities broker to his/her client, *DeRance*, 872 F.2d at 1312; *Chipser*, 600 F.2d at 1061, while *Rendl* involved a contract between a real estate broker and a landowner, 103 Ill. App.2d at 257, 242 N.E.2d at 771. As noted above, the duties owed by an officer to the corporation arise from the officer's *position* and not from an employment contract. *Racine*, 165 Wis.2d at 190, 477 N.W.2d at 329 (emphasis added). Defendants have not cited any cases in which the courts of Wisconsin have permitted a corporate officer to modify or amend by contract his/her fiduciary duties to the corporation. In fact, as mentioned in the preceding section, courts traditionally apply more "rigorous scrutiny" to transactions between an officer and his corporation. *See, e.g., Pepper v. Litton*, 308 U.S. at 306, 60 S.Ct. at 245; *Lebold v. Inland Steel*, 125 F.2d at 372.

---

24. Both Plaintiffs and Defendants agree that Defendants could not unilaterally divest themselves of any fiduciary duties. *See Jewel Companies, Inc. v. Pay Less Drug Stores Northwest, Inc.*, 741 F.2d 1555, 1563 (9th Cir.1984).

25. Defendants note they had raised these arguments earlier, and that on this basis Magistrate Judge Rosemond recommended that Count I be dismissed with prejudice. (Defendants' Opposition, at 8 (footnote).) Judge Conlon, however, reversed that recommendation on the basis that Wisconsin law does not permit a fiduciary relationship to be altered by contract. (*Id.*) The Defendants now re-raise these arguments because of new case law (*DeRance*) and a new motion (summary judgment).

Nor is the court persuaded by Defendants' attempt to draw a parallel between this case and *Rendl v. Anderson*, 103 Ill.App.2d 255, 242 N.E.2d 767. In *Rendl*, a fiduciary entered into an option to purchase real estate from his principal while agreeing to find a buyer for the property. *Id.* When the fiduciary discovered that the land could be subdivided and thus made more valuable, the fiduciary exercised his option and purchased the land himself. *Id.* The court concluded that the fiduciary had not breached his duty to the principal because at the time of signing the agreement, the fiduciary did not know the land could be subdivided and thus had acted in good faith. *Id.*

Defendants suggest that they, like the defendant in *Rendl*, acted in good faith because prior to the time they signed the Purchase and Sale Agreement they had had no contacts with PDM and were unaware that PDM would be interested in purchasing Chicago Steel/CSFM. (Defendants' Opposition I, at 9–11.) Defendants also claim that the Agreement bound Plaintiffs to sell the company to Defendants while authorizing Defendants to re-sell the company to a third party. (*Id.*) Thus, Defendants contend they did not breach any duty by negotiating the sale of the company to PDM without informing Plaintiffs. (*Id.*) In the case before the court, however, the issue is not whether Defendants entered into the Purchase and Sale Agreement in good faith but whether Defendants' fiduciary duty extended beyond the date of its signing. As explained earlier, this court has concluded that Defendants, as officers, could not and did not modify their fiduciary duties by means of this contract. At most, the Agreement modified (i.e., held in abeyance) any duty Defendants may have had to try to find a buyer for the property.[26] The Agreement said nothing that limits Defendants' duty as officers to disclose all pertinent facts relating to a potential corporate opportunity.

 Furthermore, *Rendl* actually may be a stumbling block to Defendants' case. The *Rendl* court concluded that where a fiduciary duty exists at the time of a transaction between the fiduciary and the principal, and the fiduciary appears to gain from the transaction, the transaction is presumptively fraudulent. 103 Ill.App.2d at 261, 242 N.E.2d at 771–72; *see also Highway Insurance Company v. Korman*, 40 Ill.App.2d 439, 450, 190 N.E.2d 124, 129 (1st Dist.1963) ("[D]irectors of a corporation cannot acquire the property of the corporation without exercising the utmost good faith.... The sale is presumptively fraudulent." (cites omitted)). The burden is on the fiduciary to rebut such a presumption with clear and convincing evidence that the fiduciary had exercised good faith and did not betray the trust that had been placed in him/her. *Rendl*, 103 Ill. App.2d at 269, 242 N.E.2d at 771–72. Specifically, the fiduciary must show: *"(1) Full disclosure of all relevant information to the subservient party; (2) Adequate consideration; and (3) Competent and independent advice to the principal before completing the transaction."* *Id.* (emphasis in original; cites omitted).

In this case, unlike in *Rendl*, Defendants failed to make full disclosure of all relevant information. This may suggest, as Plaintiffs argue, that Defendants also failed to give Plaintiffs competent and independent advice or adequate consideration before purchasing Chicago Steel/CSFM in December 1986.[27] (Plaintiffs–Counterdefendants' Reply Brief in Support of Motion for Summary Judgment on Count I of Complaint (hereinafter "Plaintiffs' Reply I", at 9–10.))

Defendants' remaining argument focuses on the termination clause in the Purchase and Sale Agreement.[28] Specifically, Defen-

---

**26.** As mentioned earlier, it is not material whether Defendants were personally responsible for finding a buyer for the company, given that they were officers and were aware of the Plaintiffs' interest in selling the company.

**27.** For the purpose of determining Defendants' fiduciary duties, it is not necessary to resolve whether the consideration paid by Defendants was adequate.

**28.** The relevant portion of this clause reads:

10. *Termination; Financing Contingency.* The obligations of the Seller, Stockholders and Buyers to close the sale and purchase of assets contemplated hereby shall terminate if any one of the following events shall occur:

(a) Buyers are unable to obtain a Financing Commitment on or before October 15, 1986. The term 'Financing Commitment' shall mean a written commitment from a financial

dants argue that the Agreement bound Plaintiffs to sell Chicago Steel/CSFM to Defendants, and that the termination clause was intended solely to limit Defendants' damages in the event they were unable to meet their financing commitment. (Defendants' Opposition I, at 11.) Defendants also argue that Plaintiffs misconstrue the clause by claiming they could have taken advantage of Defendants' delay in securing financing by terminating the Agreement and pursuing a deal with PDM.[29] (*Id.*)

Defendants cite two cases as authority for the proposition that a financing contingency clause exists for the benefit of the buyer, not the seller. (*Id., citing Stearns v. Western*, 87 Ill.App.2d 465, 232 N.E.2d 126 (1st Dist. 1967); *Woodland Realty, Inc. v. Winzenried*, 82 Wis.2d 218, 262 N.W.2d 106 (1978).) Notably, however, this so-called rule does not appear as such in either case; rather, it is only a consequence of the particular facts of each case. In *Stearns*, for example, the court held that the prospective purchasers of realty were entitled to recover their earnest money deposit from the prospective vendors because under the "subject to financing" clause in their agreement, the parties had not contemplated that the vendors would make a mortgage offer, and such offer contained various conditions that were not shown to be matters of custom and usage. 87 Ill.App.2d 465, 232 N.E.2d 126. The court found that the vendor's offer was merely a counter-offer and did not comply with the original contract; thus, it did not entitle vendors to retain the purchasers' earnest money deposit. *Id.* Similarly, in *Woodland Realty*, a real estate broker sued his clients, the property owners, to recover a commission allegedly due under the listing contract for the sale of the owners' home. The court held that a "subject to financing" clause in the

institution of recognized standing to finance the purchase of assets contemplated by this letter on terms and conditions reasonably satisfactory to Buyers, which terms and conditions are not inconsistent with the terms of this letter and do not require any additional material commitment or consideration by the Seller or any of its affiliates....

(Letter from Ehle, et al. to Elbert, McKee, and Jasica of August 19, 1986, Ex. PX–5 to Plaintiffs' Rule 12(m) Statement on Count I.)

purchase contract was a condition precedent to the performance of the prospective buyer; thus, when the buyer proved unable to obtain financing due to an improper interest rate escalation clause, the contract was not binding and the broker was not entitled to his commission. 82 Wis.2d at 224, 262 N.W.2d at 109.

In fact, *Stearns* and *Woodland Realty* actually undermine Defendants' argument. In *Stearns*, the court held that contracts that are neither ambiguous nor of doubtful construction "must be construed to give effect to the intention of the parties as expressed in the agreement, and to this end the contract shall be construed as a whole...." 87 Ill. App.2d at 475, 232 N.E.2d at 131. The court in *Woodland Realty* explained that a condition precedent acts to delay enforceability of a contract until the condition is fulfilled. 82 Wis.2d at 224, 262 N.W.2d at 108–109. While a minor deviation from a condition may be acceptable, a material deviation would render the contract unenforceable. *Id.*

In this case, Defendants failed to obtain sufficient financing by the October 15, 1986 deadline in the Purchase and Sale Agreement. Under the rationale of *Stearns* and *Woodland Realty*, this was a material deviation from an express condition in the contract; thus, the contract was no longer binding. Moreover, the termination clause states unambiguously that Plaintiffs (or Defendants) could have terminated their obligations as a result of Defendants' failure to obtain financing. Thus, Plaintiffs could have terminated the contract and entered into negotiations with a third party, such as PDM, anytime after October 15, 1986 and before December 12, 1986 when they closed the sale to Defendants. Consequently, Defendants'

**29.** Defendants also contend that since they bore the risk of any loss after signing the Agreement, Plaintiffs should not be able to rewrite the contract to recover everything without having shared the risk. (Defendants' Opposition I, at 9, *citing Brekken v. Readers Digest Special Products, Inc.*, 353 F.2d 505, 506 (7th Cir.1965) (courts cannot rewrite contracts agreed to by the parties).) This court is not interested in rewriting the parties' contract, however, only in interpreting it properly.

argument that the Purchase and Sale Agreement terminated their fiduciary duties simply does not withstand scrutiny.

Finally, Defendants argue that Plaintiffs waived their right to terminate the Agreement when they elected to pursue the sale regardless of Defendants' failure to obtain financing. (Defendants' Opposition I, at 11.) Defendants allege that prior to the October 15 deadline, Plaintiffs knew about the need for additional financing; stated that Defendants' financing commitment was adequate; and agreed to provide any additional financing. (*Id.*)

Even if proven, these facts—that Plaintiffs found Defendants' financing adequate or agreed to provide additional financing—would not require the conclusion that Plaintiffs waived their right to terminate the contract. The issue is not whether Plaintiffs chose to uphold the Agreement given the circumstances that Plaintiffs believed existed. Rather, the issue is whether Plaintiffs *would have* proceeded with the Agreement *had they been apprised* of PDM's potential interest in purchasing CSFM. In other words, the issue is whether the sale of Chicago Steel/CSFM to PDM represented a potential corporate opportunity that was lost to Plaintiffs. It is to this question that the Court will now turn.

### B. *Presence (or Absence) of a Corporate Opportunity Is a Genuine Issue of Material Fact*

Having established that Defendants were officers of Chicago Steel/CSFM and thus owed a fiduciary duty to Plaintiffs, the court must examine whether the sale of the company to PDM represented a lost potential corporate opportunity for Plaintiffs. This question is essential to the summary judgment motions of both parties; in fact, it is the sole basis for Defendants' motion. (Defendants' Memorandum in Support of Motion for Summary Judgment on Count I of Plaintiffs' Complaint (hereinafter "Defendants' Memorandum I"), at 3–4.)

Given the number of purported facts on this question, the court will briefly summarize the material assertions by both parties. Plaintiffs contend that:

- Chicago Steel/CSFM was a more efficient facility and better able to serve the Chicago area than PDM's existing facilities. Thus, Plaintiffs claim PDM may have considered acquiring the company *for its own sake.*

- PDM purchased a steel fabrication plant in California in 1987, which suggests that PDM may have been interested in acquiring other facilities as well, such as Chicago Steel/CSFM.

- PDM requested and obtained extensive financial documentation on Chicago Steel/CSFM from Defendants, suggesting that PDM was interested in the inherent value of the company's assets and profitability.

- Had Plaintiffs been informed of PDM's interest, Plaintiffs may have reconsidered whether to go forward with the sale to Defendants; to approach PDM directly; or to restructure the sale and thereby share in some of the alleged $2,750,000 in profits obtained by Defendants. (Plaintiffs' Opposition I, at 3–4.)

On the basis of these and other facts, Plaintiffs contend that there is no genuine issue that the sale of Chicago Steel/CSFM represented a lost corporate opportunity.

Defendants, on the other hand, assert the following:

- PDM had no interest in acquiring any new steel fabrication plants, due to PDM's poor financial situation, weak market conditions, and the underutilization of its existing facilities. Thus, Defendants assert that Plaintiffs could not have sold Chicago Steel/CSFM directly to PDM under any circumstances.

- PDM's purchase of a California plant was intended solely to replace an outdated plant and to take advantage of that plant's high property value. It did not indicate any interest by PDM to expand its steel fabrication business.

- PDM viewed Chicago Steel/CSFM's facility as being outdated but run efficiently by Defendants. PDM had no interest in the plant for its own sake.

- PDM, in desperate need of strong leadership and management, was interested solely in obtaining the personal services and expertise of Defendants. Given that Defendants had a made a prior commitment to purchase and operate Chicago Steel/CSFM, PDM had no choice but to purchase Chicago Steel/CSFM in order to obtain Defendants' services.

- Plaintiffs had no control over Defendants, and Plaintiffs could not have offered Defendants' services as part of any deal with PDM. Thus, Plaintiffs could not have participated in any three-way transaction with PDM and Defendants.

- Any premium paid by PDM above Defendant's purchase price for Chicago Steel/CSFM reflected solely PDM's interest in acquiring Defendants' services, not any inherent value in the company to PDM. Thus, Plaintiffs could not have shared in any profits paid to Defendants by PDM.

- Plaintiffs have admitted that they do not know what they might have done had they been informed of PDM's interest; thus, there was no corporate opportunity.

On the basis of these facts, Defendants argue that Plaintiffs' claim must fail as a matter of law because Plaintiffs could not have availed themselves of the opportunity even if they had been advised of PDM's interest. (Defendants' Opposition I, at 8, citing *Peterson Welding Supply Co. v. Cryogas Products, Inc.*, 126 Ill.App.3d 759, 81 Ill.Dec. 946, 467 N.E.2d 1068 (1st Dist.1984); *Northwestern Terra Cotta Corp. v. Wilson*, 74 Ill.App.2d 38, 219 N.E.2d 860, 864 (1st Dist.1966).) [30]

Despite (or perhaps because of) the extensive documentary material submitted by both parties, neither party has been able to establish that there is no genuine issue as to the presence (or absence) of a corporate opportu-

nity. On this basis, this court recommends that both motions for summary judgment on Count I of Plaintiffs' Amended Complaint be denied.

Turning first to Plaintiffs' motion, the court notes that Defendants have provided compelling evidence that PDM agreed to purchase Chicago Steel/CSFM solely to obtain the services of Elbert, McKee, and Jasica. Moreover, in weighing Plaintiffs' motion, the court is compelled to make all reasonable inferences in favor of Defendants. With that principle in mind, the court may infer that any premium paid by PDM for the purchase of Chicago Steel/CSFM reflected only the value of Defendants' services and not any appreciation in the company's assets. The court may infer further that any financial information provided to PDM by Defendants did not reflect any inherent interest in Chicago Steel/CSFM. Finally, Plaintiffs have not provided evidence to show that the Chicago Steel/CSFM transaction offered any benefits similar to those of PDM's acquisition of the California facility; thus, Defendants are entitled to the inference that there were no such benefits. Consequently, the court concludes Plaintiffs have not shown that there is no genuine issue of material fact regarding PDM's reasons for purchasing Chicago Steel/CSFM and that a reasonable jury could return a verdict in favor of Defendants. *See Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510 (a court must dismiss the motion only if there is sufficient evidence for a reasonable jury to return a verdict favorable to the non-movant). Accordingly, this Court recommends Plaintiffs' motion for summary judgment on Count I be denied.

As the court turns to Defendants' motion, all inferences must be made in favor of Plaintiffs, and Defendants bear the burden of showing there is no genuine issue of material fact. With this in mind, the court concludes that Plaintiffs have presented a number of specific facts that rise above the level of

---

30. Plaintiffs seek to distinguish the present case from both *Peterson* (where plaintiffs had access to all relevant information and defendants were willing to disclose) and *Northwestern Terra Cotta* (where plaintiffs had been fully informed of and rejected the alleged corporate opportunity). While the cases may be factually distinguishable from this one, nonetheless they do support the general principle for which Defendants have cited them, i.e., that a claim that a fiduciary has usurped a corporate opportunity fails as a matter of law if the corporation could not have availed itself of the opportunity.

mere "metaphysical doubt." *Matsushita Electric*, 475 U.S. at 586, 106 S.Ct. at 1355. For example, PDM officials admitted that the Chicago Steel/CSFM facility was more efficient and better able to serve the Chicago market than PDM's existing facilities. As for the financial data provided to PDM, the court notes that PDM was willing to pay some $2.75 million above Defendants' purchase price of Chicago Steel/CSFM, even though Defendants were no longer obligated to purchase the company because they did not meet their October 15 financing deadline. Such facts and inferences suggest that PDM may have had some interest in Chicago Steel/CSFM's assets beyond obtaining Defendants' services, and that Plaintiffs may have been able to structure some kind of deal with PDM on this basis. The court concludes that a reasonable jury could return a verdict in favor of Plaintiffs and recommends denial of Defendants' motion.[31]

## C. Defendants' Ethical Duties of Good Faith, Loyalty, and Fair Dealing

The court now turns to the third and final step of its analysis of the motions on Count I. In *Racine*, the court held that if the plaintiff can show that a corporate opportunity existed, then the burden of proof shifts to the defending officer or director to prove that there was no breach of his/her fiduciary duties. 165 Wis.2d at 195, 477 N.W.2d at 331. If, however, the plaintiff has been unable to show that a corporate opportunity existed, then the plaintiff's claim fails as a matter of law. *Id.*

As discussed in the preceding section, Plaintiffs have not met their burden of proof for the purposes of their motion for summary judgment. Thus, the question of whether Defendants breached their fiduciary duties of loyalty, good faith, and fair dealing is premature. Were a jury, however, to conclude that there had been no corporate opportunity, then as a matter of law Defendants could not have breached their fiduciary duties by failing to disclose their negotiations with PDM to Plaintiffs. *See id.*

This court also recommended denial of Defendants' motion because they have not eliminated all disputes with respect to the existence of a corporate opportunity. Were a jury to conclude that the sale to PDM represented a lost corporate opportunity for Plaintiffs, then Defendants' situation would become more problematic. As fiduciaries, Defendants had a duty to disclose to Plaintiffs all material information relating to a corporate opportunity. *Havlicek/Fleisher Enterprises*, 788 F.Supp. at 399; *General Automotive Mfg. Co. v. Singer*, 19 Wis.2d 528, 120 N.W.2d 659 (1963).[32] To determine whether Defendants breached their fiduciary duties, the court would consider a number of equitable factors, such as the degree of day-to-day management and control exercised by Defendants; whether the opportunity seized by Defendants placed them in direct competition with Plaintiffs; and whether Defendants had made full disclosure to Plaintiffs and allowed Plaintiffs to decide for themselves whether to pursue a deal with PDM. *Racine*, 165 Wis.2d at 195–96, 477 N.W.2d at 331–32. Moreover, Defendants may be held to a rigorous standard of disclosure and candor because they were transacting business with their own company. *See Pepper*, 308 U.S. at 306, 60 S.Ct. at 245.

**31.** Before concluding this section, the court must dispense with Plaintiffs' interpretation of *Kerrigan v. Unity Savings Assoc.*, 58 Ill.2d 20, 317 N.E.2d 39 (1974). Plaintiffs contend that *Kerrigan* stands for the principle that an agent may not hide behind the claim that no corporate opportunity existed in order to justify concealing from his/her principal information relevant to a corporate opportunity. (Plaintiffs' Opposition I, at 11–13.) Plaintiffs, however, have misread *Kerrigan*. In *Kerrigan* the court *first* determined that a corporate opportunity existed *before* visiting the question of non-disclosure. 58 Ill.2d at 27–29, 317 N.E.2d at 42–44. In other words, *Kerrigan* does not say a fiduciary is required to disclose an opportunity of which the principal could not

have availed itself. Moreover, *Kerrigan* is consistent with *Racine*, which holds that a court must first determine whether a corporate opportunity existed before examining the circumstances surrounding the fiduciary's non-disclosure. *Racine*, 165 Wis.2d at 195, 477 N.W.2d at 331. Non-disclosure without a tangible, legitimate corporate opportunity does not give rise to liability. *Id.*

**32.** Plaintiffs also cite a number of Illinois cases on this issue which are consistent with Wisconsin cases law on fiduciary duties. (Plaintiffs' Brief I, at 4, 7.)

In weighing these and other facts, a reasonable jury could conclude that Defendants breached their duties. In particular, the facts show that Defendants failed to disclose any of their discussions with PDM to Plaintiffs; that Defendants did exercise substantial control at Chicago Steel/CSFM; and that Defendants' negotiations with PDM may have brought them into competition with Plaintiffs.

## CONCLUSION

The evidence establishes that Defendants were officers of Chicago Steel/CSFM and thus owed fiduciary duties to Plaintiffs during the relevant time period. Neither party has been able to show that there are no disputes of material fact regarding the issue of whether the sale of Chicago Steel/Illinois to PDM represented a corporate opportunity for Plaintiffs. On this basis, the motions of both parties for summary judgment on Count I of Plaintiffs' Amended Complaint should be denied.[33]

Dated: August 1, 1994

ENTER:

/s/ Rebecca R. Pallmeyer
REBECCA R. PALLMEYER
United States Magistrate Judge

Counsel have ten days from the date of service to file objections to this Report and Recommendation with the Honorable George W. Lindberg. *See* FED.R.CIV.P. 72(b); 28 U.S.C. § 636(b)(1). Failure to object constitutes a waiver of the right to appeal. *Egert v. Connecticut General Life Ins. Co.*, 900 F.2d 1032, 1039 (7th Cir.1990).

---

**33.** Given that the court is recommending denial of both motions on Count I, it is premature to examine Plaintiffs' arguments that the court should impose the equitable remedy of a constructive trust on the assets purchased by Defendants.